# In the United States Court of Federal Claims

No. 12-529L

(Filed: July 16, 2013)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| QUAPAW TRIBE OF OKLAHOMA, <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | Indian Tribe Claims for Tribal Trust Fund Mismanagement; Rule 12(b)(1) and (b)(6) Motion to Dismiss; Fiduciary Duties to Indian Tribes; 28 U.S.C. § 2501; Statute of Limitations; Effect of Appropriations Act Riders. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Nancie G. Marzulla,* with whom were *Roger J. Marzulla,* Marzulla Law, LLC, Washington, D.C., *Stephen R. Ward* and *John L. Williams*, Conner & Winters, LLP, Tulsa, Oklahoma, Of Counsel, for Plaintiffs.

*Stephen R. Terrell,* Trial Attorney, with whom were *Ignacia S. Moreno,* Assistant Attorney General, and *Anthony Hoang*, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., *Shani Walker* and *Joshua Edelstein,* Office of the Solicitor, U.S. Department of Interior, *Thomas Kearns* and *Rebecca Saltiel*, Office of the Chief Counsel, Financial Management Service, U.S. Department of the Treasury, Of Counsel, for Defendant.

## OPINION AND ORDER ON DEFENDANT'S MOTION TO DISMISS

WHEELER, Judge.

Plaintiff, the Quapaw Tribe of Oklahoma,[1] is a federally recognized Indian nation. The Quapaw Tribe commenced this action on September 11, 2012 by filing a complaint for money damages arising from Defendant's alleged breach of fiduciary and trust obligations owed to the Quapaw Tribe. The complaint contains three causes of action.

---

[1] "Quapaw" is an anglicized word for the "O-Gah-Pah" Indian nation, which means "the people who went downstream" or "the Downstream People." Compl. ¶ 4.

On November 13, 2012, Defendant filed a motion for partial dismissal of the complaint, asserting that the Court lacks subject matter jurisdiction or that Plaintiff had failed to state claims upon which relief can be granted. In the alternative, Defendant requested that the Court order Plaintiff to file a more definite statement of its claims. Defendant excepted from its motion Plaintiff's claims for annuity payments under the Treaty of 1833 and leasing claims for the Quapaw Industrial Park. Plaintiff filed an opposition to Defendant's motion on December 28, 2012, and Defendant filed a reply on January 11, 2013. The Court heard oral argument on June 4, 2013.[2]

Under Rule 8 of the Court of Federal Claims ("RCFC"), a pleading must include "a short and plain statement" of the basis for jurisdiction and the plaintiff's claims, as well as a demand for the relief sought. For the reasons explained below, Plaintiff's complaint generally meets the notice pleading requirements of Rule 8, and therefore, Defendant's motion for a more definite statement is denied. However, the Court grants Defendant's motion to dismiss Plaintiff's second and third causes of action, as they are barred by the statute of limitations.

I.   Factual and Procedural History

As set forth in the related case brought by the individual tribe members, Goodeagle v. United States, No. 12-431L, this case has a lengthy history. Below, the Court incorporates the facts as set forth in Goodeagle, including additional facts relevant to Tribe-specific claims.

According to the complaint, the Quapaw Tribe's homeland for many centuries was near the confluence of the Mississippi and Arkansas Rivers in the eastern and south-central portions of the present-day State of Arkansas. Compl. ¶ 4. When Europeans first encountered the Quapaw in the 1670s, approximately 15,000 to 20,000 tribe members lived in villages in this region. Id. Historically, the Quapaw engaged in agricultural endeavors, and their lives centered around farming villages. Id.

In 1818, under pressure from white settlements and a territorial government, the Quapaw Tribe signed a treaty ceding most of their land in Arkansas to the United States. Id. at ¶ 5. The ceded land included the hot springs area which today is Hot Springs National Park. Id. In 1824, the United States forced the Quapaw to cede the remainder

---

[2] Judge Susan G. Braden originally was assigned to this case. By mutual agreement, due to the previous assignment of a related case to Judge Thomas C. Wheeler, Judge Braden transferred this case to Judge Wheeler on March 29, 2013. For similar reasons, Judge George C. Miller then transferred a third related case to Judge Wheeler on April 2, 2013. The related cases are Grace M. Goodeagle, et al. v. United States, No. 12-431L, and Thomas Charles Bear et al. v. United States, No. 13-51X, a congressional reference case.

of its land in Arkansas, moving them to an area in northeastern Louisiana on the south side of the Red River.  Id.  The Quapaw were unwelcome in Louisiana.  Id. at ¶ 6.  Their lands flooded, and starvation became rampant.  Id.  The Quapaw became a homeless nation, and many of the people returned to their former homeland in Arkansas.  Id.

Later, the United States again moved the Quapaw Tribe, this time to a more northern location along the present-day border between Oklahoma and Kansas.  Id. at ¶ 7.  Under a May 13, 1833 treaty, the United States established a reservation for the Quapaw, consisting of 150 sections of land west of the Missouri state line, between the lands of the Seneca and Shawnee Tribes.  Id.  According to the treaty, the United States promised this land to the Quapaw Tribe as a homeland for "as long as they shall exist as a nation or continue to reside thereon."  Id. (citing treaty).

In the early 20th century, the United States began to manage a significant portion of Quapaw Tribal lands as lead and zinc mining fields.  Id. at ¶ 26.  Plaintiff alleges that "mining companies were permitted to exploit the minerals without taking lawfully required and reasonable measures to prevent waste and contamination," such that today, "a large portion of the Tribe's original reservation consists of the Tar Creek Superfund Site."  Id.  Plaintiff alleges that the failure to appropriately manage the natural resources of Indian trust lands deprived the Tribe "of the income and monies that otherwise would have been available if the Tribal land had not been degraded by Government mismanagement."  Id. at ¶ 28.

Part of Plaintiff's trust land includes the "Catholic 40," a 40-acre tract consisting of "24.44 acres of pasture land, 15 acres of mine wastes or 'chat,' and 0.56 acres of a cemetery."  Id. at ¶ 18.  Plaintiff alleges that in 1908, the Secretary of the Interior deeded the property to the Catholic Church without appropriate approval by the Tribe.  Id.  According to Plaintiff, from 1927 to 1975, the church removed lead and zinc ore from the premises, sold chat, and left chat on the property.  Id. at ¶ 19.  Plaintiff further alleges that in 1977, the Bureau of Indian Affairs made a chat lease on the Catholic 40.  Id.  The Catholic 40, with the exception of the cemetery, was eventually returned to trust status in the 1980s, but the previous use of the land has rendered it "an unusable wasteland."  Id. at ¶ 20.  Plaintiff alleges that it has been deprived of the use of the property and also of substantial sums of money in the form of land rent, mineral royalties, and interest thereon.  Id. at ¶ 21.

The Quapaw Tribal Industrial Park, another portion of Plaintiff's trust land, consists of 568.02 acres, and was purchased for the Quapaw in 1937 under the Rehabilitation Act.  Id. at ¶ 22.  Respecting this land, Plaintiff alleges that Defendant breached its fiduciary duty and trust obligations by failing to collect lease rental payments, granting rights-of-way and other easements for little or no consideration, and failing to collect rent payments from easements.  Id. at ¶¶ 23-25.

In 2002, the Tribe commenced legal action in the U.S. District Court for the Northern District of Oklahoma in a case captioned Quapaw Tribe of Oklahoma (O-Gah-Pah) v. U.S. Department of the Interior, No. 02-CV-129-H(M) (N.D. Okla.). The Quapaw Tribe requested an accounting of the historical federal management of the Tribe's trust assets. On November 5, 2004, the Quapaw Tribe entered into a settlement agreement with the United States whereby the parties agreed that Quapaw Information Systems, Inc., a not-for-profit Tribal entity, would prepare an analysis of the Government's management of Tribal assets ("the Quapaw Analysis"). Compl. ¶ 9. The Tribe agreed to dismiss its lawsuit and to waive any rights to an accounting of its trust assets up to and including the date of the settlement agreement. Id. Upon completion of the Quapaw Analysis, the Tribe would be deemed to have been furnished with an accounting of the Tribe's trust assets. Id. In entering into this settlement agreement, the Quapaw Tribe reserved all claims for money damages arising from past events and transactions. The settlement did not purport to compromise or waive the claims of any tribe member for money damages. Id. at ¶ 10.

Between 2004 and 2010, Quapaw Information Systems investigated and prepared the Quapaw Analysis. Id. at ¶ 11. The team performing this review undertook a comprehensive examination of files and documents made available by the Office of Historic Trust Accounting and other agencies to determine whether and to what extent the Department of Interior met its fiduciary obligations to the Tribe and individual trust beneficiaries. Id. On June 1, 2010, Quapaw Information Systems completed and transmitted the Quapaw Analysis Report to the Government. Id. at ¶ 12. On November 19, 2010, the Department of Interior accepted the report as complete. Id. Plaintiff states that the Quapaw Analysis identified many pervasive breaches of the Government's fiduciary duty to the Quapaw Tribe. Id. at ¶ 13.

Plaintiff's September 11, 2012 complaint in this Court contains the follow three causes of action: (1) mismanagement of tribal trust accounts; (2) failure to collect or deposit payments for Tribal lands; and (3) failure to properly manage natural resources and Tribal lands, resulting in lost income. Compl. ¶¶ 7-28. In its motion for partial dismissal, Defendant contends that, with the exception of Plaintiff's claims for annuity payments under the Treaty of 1833 and leasing payments for the Quapaw Industrial Park, all other claims should be dismissed for failure to allege sufficient jurisdictional facts or as untimely. Having been fully briefed and argued, Defendant's motion is ready for decision.

II.     Standard of Review

Jurisdiction is a threshold matter which must be established "before the court may proceed with the merits." Overview Books, LLC v. United States, 72 Fed. Cl. 37, 40

(2006) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88-89 (1998)).  When ruling on a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), the court must accept all undisputed factual allegations as true and draw all reasonable inferences in favor of the plaintiff.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995).  The burden lies with the plaintiff to establish jurisdiction through a preponderance of evidence.  Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).

Under Rule 12(b)(6), a plaintiff is only required to offer "'a short and plain statement,'" showing a plausible claim for relief to survive a motion to dismiss.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  In deciding whether a party is required to file a more definite statement of fact under Rule 12(e), "the trial judge has full authority, in his discretion, to order a more definite statement or to take such other action as he deems appropriate to focus the issues more clearly or definitely[.]"  Johns-Manville Corp. v. United States, 12 Cl. Ct. 1, 16 (1987) (citation omitted).

   III.   Discussion

      a. Plaintiff's First Cause of Action

In its first cause of action, Plaintiff alleges that the United States breached its fiduciary duty to the Tribe by mismanaging the Quapaw Tribal trust accounts.  Plaintiff alleges that "monies due to the Tribe were not paid or collected, funds received were not accurately recorded and instead were commingled with other funds, and funds were lost due to inappropriate record-keeping and other mismanagement."  Compl. ¶ 15.  Defendant moved to dismiss this claim, arguing that Plaintiff has failed to allege a violation of any relevant statute or regulation that is money-mandating in breach.  Def.'s Mot. 9.  Moreover, Defendant argues that Plaintiff's claim incorporates "accounting" claims, claims which the Plaintiff previously waived in the 2004 settlement agreement between the Tribe and the Government.  Id. at 10.  Alternatively, Defendant requests a more definite statement as to the allegedly unpaid or uncollected funds Plaintiff seeks in damages.  Id. at 11-12.

The Court finds Plaintiff's first cause of action to be precisely what its heading describes: "Mismanagement of Tribal Trust Accounts."  Compl. ¶ 14.  Under 31 U.S.C. § 1321 and 25 U.S.C. §§ 161a, 162a, the United States had a fiduciary duty as trustee to deposit and appropriately manage tribal trust funds.  The very purpose of the settlement was to allow for an accounting "from which the [Tribe] can determine whether there has been a loss."  Opp'n at Ex. A, ¶ 4 (2004 Settlement Agreement).  Based on the information revealed in the accounting, Plaintiff alleges it suffered losses as a result of the mismanagement of the tribal trust funds.  Here, Plaintiff alleges that the Government

was obligated to collect certain monies for the Tribe, such as $1,000 annually for education purposes under the Treaty of 1833, but no record can be found of such payments being received. Compl. ¶ 15. The alleged failure to collect and deposit these sums would be a breach of the Government's fiduciary duty to manage and collect monies due to the Tribe. See Shoshone Indian Tribe of the Wind River Reservation v. United States, 364 F.3d 1339, 1350 (Fed. Cir. 2004) ("Shoshone II") (finding Government responsible for collecting and managing all payments relating to mining leases, and further required to "deposit and accrue interest on such proceeds pursuant to the general trust provisions of 25 U.S.C. §§ 161a, 161b, and 162a"). Therefore, Plaintiff may pursue its claim of tribal trust fund mismanagement.

The final accounting process would surely be a hollow exercise if the Government could obtain a dismissal of trust fund loss claims merely by demonstrating that it has no records of funds the Government itself was entrusted to deposit and maintain for the benefit of the Tribe. "As part of its duties, a trustee must keep clear and accurate accounts, showing what he has received, what he has expended, what gains have accrued, and what losses have resulted." Shoshone II, 364 F.3d at 1351 (quoting 2A Scott on Trusts § 172 (2001)). At this stage of the proceedings, the Court finds that Plaintiff's factual allegations within the complaint, supported by the Quapaw Analysis, are sufficient to show a plausible claim to relief. See Twombly, 550 U.S. at 555. Accordingly, the Court denies the Government's motion to dismiss Plaintiff's first cause of action.

To the extent that Plaintiff has asserted a valid claim in its first cause of action, Defendant requests the Court to compel Plaintiff to file a more definite statement of its claim. Rule 8(a) establishes the standards for a sufficiently pled claim: "plaintiffs must only include in their pleading '(1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment of the relief the pleader seeks.'" Fed. Air Marshals v. United States, 74 Fed. Cl. 484, 488 (2006) (quoting RCFC 8(a)). According to Rule 12(e), "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." RCFC 12(e). Essentially, "[t]he rule 'is designed to remedy unintelligible pleadings, not to correct for lack of detail.'" Kuklachev v. Gelfman, 600 F. Supp. 2d 437, 456 (E.D.N.Y. 2009) (quoting Dunlop-McCullen v. Local 1-S RWDSU-AFL-CIO, 1994 WL 478495, at *1 (S.D.N.Y. Sept. 1, 1994)).

Defendant argues that because the complaint fails to "identify the funds at issue[,] state when the funds were allegedly unpaid or uncollected[,] and specify the amount of funds that were allegedly unpaid or uncollected," the United States cannot respond in a meaningful manner. Def.'s Mot. 11. Defendant has in its possession both the Quapaw

Analysis and "the database in which up to half-a-million documents were collected and analyzed" to create the Quapaw Analysis. Opp'n 32-33. Accordingly, Defendant's argument that it lacks sufficient information to meaningfully respond fails to persuade the Court that a more definite statement is appropriate. See Fed. Air Marshals, 74 Fed. Cl. at 488 ("[c]onsidering defendant has control over the[] records itself, it can easily access those documents in discovery . . . [t]herefore the court denies defendant's Motion for a More Definite Statement.")  In this instance, Plaintiff's allegations relating to the mismanagement of tribal trust accounts in its first claim meet the notice pleading requirement of Rule 8. Plaintiff's claim establishes a basis for relief and is sufficiently intelligible and detailed.

b. Plaintiff's Second Cause of Action

Plaintiff's second cause of action involves alleged mismanagement of two separate plots of land, the Catholic 40 and the Quapaw Industrial Park. Defendant moves to dismiss claims regarding the Catholic 40 for two reasons: (1) Plaintiff has failed to identify a money-mandating provision that was breached by the transfer of the land to the Catholic Church, and (2) the claims are untimely. Defendant does not seek dismissal of Plaintiff's leasing claims for the Quapaw Industrial Park, but instead requests this Court to compel Plaintiff to make a more definite statement as to whether Plaintiff seeks damages for hypothetical or suboptimal leases.

i. Catholic 40

This second cause of action rests on the Government's alleged "failure to assess and collect payments owed for leases, rent payments, rights of way, and other encumbrances" on the Catholic 40 land and the Quapaw Industrial Park. Compl. ¶ 17. Plaintiff alleges that the original deeding of the Catholic 40 to the Catholic Church was unlawful and in breach of trust obligations. Opp'n 23-24. Nevertheless, Plaintiff argues that while the Catholic Church held the land, the Government breached its trust obligations to the Tribe by failing to collect land rent from the Catholic 40, as well as failing to collect and deposit the proceeds from mineral and chat sales in the Tribe's trust account. Opp'n 24.[3]

---

[3] The Court notes these seemingly inconsistent damages theories stem from the arguments presented throughout the briefing and oral argument. Compare Compl. ¶ 18 ("The Secretary's transfer of this trust land to the Catholic Church was a flagrant violation of Defendant's fiduciary duty and trust responsibility to the Tribe."), with Opp'n 26 ("[T]he Government's arguments regarding transfer of the land to the Catholic Church and acceptance of the land into trust are irrelevant because the Tribe asserts no such claims."), and Tr. 73 (N. Marzulla) ("it's our contention that [the transfer of the property to the Catholic Church] was ultra vires").

In alleging that the transfer of property to the Catholic Church was unlawful, Plaintiff points to no provision of law that has been violated. The regulatory provisions cited in Plaintiff's opposition brief refer to fiduciary obligations regarding the duty to monitor leases on trust property. See Compl. ¶ 15; Opp'n 22-23. Those provisions are inapplicable to the situation here, which involves a transfer in fee. Even if Plaintiff had identified a violation of some relevant legal provision, its claim that the Government breached its fiduciary duty to the Tribe by virtue of the transfer would still fail because it would be barred by the statute of limitations. The alleged breach occurred in 1908, when the property was deeded to the Catholic Church. At that point, Plaintiff knew or should have known that it had been divested of the land, thereby triggering the statute of limitations on their claim. See Menominee Tribe of Indians v. United States, 726 F.2d 718, 720 (Fed. Cir. 1988) (explaining that, under 28 U.S.C. § 2501, the six-year statute of limitations runs from when plaintiff's claim "first accrue[s]"). "At a minimum, plaintiff had actual knowledge that the Catholic Mission Land was held in fee by the Catholic Church, not in trust, when the land was 'returned to trust status [in the 1980s].'"[4] Def.'s Mot. 20 (citing Compl. ¶ 20). Plaintiff did not require any of the facts in the Quapaw Analysis in order to assert this claim, and yet Plaintiff did not assert its claim of an unlawful transfer until September 11, 2012. Thus, Plaintiff's claim that the 1908 deed to the Catholic Church was "ultra vires" is untimely.

Plaintiff further alleges that "[t]he BIA made a chat lease in 1977 on these 40 acres." Compl. ¶ 19. Plaintiff argues that the Government breached its trust obligations to Plaintiff by failing to collect and deposit proceeds from sales of minerals or chat. Opp'n 24. However, Plaintiff itself avers that the land was not "returned to trust status" until the 1980s. Compl. ¶ 20. Thus, the land was not held in trust in 1977, and therefore the Government had no trust obligations regarding the land that could have been breached in 1977. See Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 338-39 (2008) (finding that even when the land at issue was previously owned by the tribe, that fact "does not change the status of the land at the time of the challenged" action). Thus, the Government's motion to dismiss Plaintiff's claims regarding the Catholic 40 is granted.[5]

---

[4] To the extent that Plaintiff seeks to apply the continuing trespass doctrine to the Catholic Church's possession of and activities on the Catholic 40, that claim is also untimely, as the Catholic Church ceased any alleged "trespass" when the land was returned to the Quapaw. See Mitchell v. United States, 10 Cl. Ct. 63, 77 (1986) (finding that although a claim for breach of a fiduciary duty arose each instance the duty was breached, "each such claim arose only once," and the six-year statute of limitations began to run from the time the duty was breached).

[5] In its opposition, Plaintiff argues that the "mountains of mining waste, toxic dust, and air pollution left by the Catholic Church's mining activities" constitute a continuing trespass. Opp'n 24-25. This argument, however, is completely unrelated to the Government's alleged failure to collect or deposit payments owed for leases, rent payments, rights of way, and other encumbrances.

        ii. Quapaw Industrial Park

With respect to Plaintiff's claims regarding the Quapaw Industrial Park property, the Government contends that a more definite statement is required. Def.'s Mot. 14. Defendant states that Plaintiff has sufficiently pled that actual leases obligated the United States to collect rent, but to the extent that Plaintiff claims those leases were suboptimal or that the United States failed to enter into hypothetical leases, those claims would be barred by the statute of limitations. Id. Although the Government's concerns have merit, the Court determines that a discussion of the relevant law is sufficient to clarify Plaintiff's claims, and therefore a more definite statement is unnecessary.

Under the various Department of Interior Appropriations Act riders issued each year from 1990 to the present, claims for losses due to mismanagement of trust funds do not accrue until the affected tribe or individual Indian has been furnished with an accounting. See, e.g., Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat. 786, 1002 ("the Appropriations Act"). Thus, even though the operative facts here began occurring decades ago, the Appropriations Act language, "notwithstanding any other provision of law," displaces the usual six-year statute of limitations in 28 U.S.C. § 2501 until an accounting is received. See Shoshone II, 364 F.3d at 1346 (citing Marcello v. Bonds, 349 U.S. 302, 310-11 (1955)). In this case, the Department of Interior accepted the Quapaw Analysis as a final accounting on November 19, 2010. This is the date the statute of limitations began to run.

The Appropriations Act riders displace 28 U.S.C. § 2501 as to claims "concerning losses to or mismanagement of trust funds." As the Federal Circuit has explained, the Appropriations Act language displaces 28 U.S.C. § 2501 in those circumstances where a "final accounting" is necessary to put the tribe on notice that a breach of a fiduciary obligation has occurred. San Carlos Apache Tribe v. United States, 639 F.3d 1346, 1355 (Fed. Cir. 2011). As applied to this case, a "final accounting" logically would be necessary to address trust fund losses on actual leases. However, a "final accounting" would not be necessary for hypothetical leases that were never executed. Thus, the Court concludes that Plaintiff's claims regarding the Quapaw Industrial Park are timely insofar as they relate to actual leases, but would not be timely as to hypothetical leases. Moreover, any claims that Quapaw Industrial Park leases were suboptimal are also untimely, as "[a] claim premised upon the terms of a lease being suboptimal is a claim related to trust assets, and, therefore, outside of the scope of the Interior Appropriations Act's tolling provision." Shoshone Indian Tribe of the Wind River Reservation v. United States, 672 F.3d 1021, 1035 (Fed. Cir. 2012) ("Shoshone IV"). Accordingly, the Court denies the Government's motion to compel a more definite statement.

c. Plaintiff's Third Cause of Action

Next, Plaintiff alleges that by failing to appropriately manage the natural resources of Indian trust lands, the Government breached its fiduciary duties and trust obligations to "[a]ppropriately manag[e] the natural resources located within the boundaries of Indian reservations and trust lands," 25 U.S.C. § 162a(d)(8). Beginning in the early 20th century, the United States managed a significant portion of tribal lands as a lead and zinc mining field. Compl. ¶ 26. Plaintiff argues that the Government's failure "to prevent unnecessary and undue degradation of Tribal lands and resources[] destroy[ed] the Tribe's ability to collect income that otherwise would have been generated from the leasing and renting of the Tribal lands." Id. at ¶ 27. The Government urges the Court to dismiss this claim for lack of jurisdiction, arguing that Plaintiff fails to allege a violation of a money-mandating provision, and regardless, Plaintiff's claim amounts to a request for damages from consequential harm, which is barred by Mitchell v. United States, 664 F.2d 265 (Ct. Cl. 1981).[6]

Plaintiff does not allege that the mining leases themselves were unlawful, but instead that the Government's failure to prevent land degradation by the lessees was a breach of a fiduciary duty owed to the Tribe. The waste and contamination on tribal land, according to Plaintiff, is the cumulative effect of the Government's alleged failure to properly manage the land's natural resources and supervise the mining activities thereon. "That failure, and the consequential damages resulting from it, constitute the actionable wrong that [Plaintiff] seek[s] to vindicate." Brown Park Estates-Fairfield Dev. Co. v. United States, 127 F.3d 1449, 1457 (Fed. Cir. 1997). Plaintiff then asks for a second layer of consequential damages: hypothetical leasing and rental income it might have received had the land and its resources not been degraded. Compl. ¶ 27.

Plaintiff is barred from recovering either layer of consequential damages, however, because "plaintiffs are not entitled to sue" for consequential damages "experienced by the Indian owners or the tribe as a consequence of federal mismanagement of their property." Mitchell, 664 F.2d at 273-74. As discussed above, any trust mismanagement claims based on hypothetical leases are barred by the statute of limitations. See San Carlos Apache Tribe, 639 F.3d at 1355. Therefore, Plaintiff cannot pursue a claim seeking payments from leases that may have been executed if not for the waste and contamination. Moreover, the mining activities that caused this waste and contamination have long since ceased. Plaintiff has been aware of the degradation and the absence of leases on the land since at least 1983, when the land was designated as the

---

[6] The Government also argues that the "extensive and specific environmental damages remedies available to plaintiff under CERCLA displaces any 'breach of trust' claim under the Tucker Acts . . . in this Court for the same damages." Def.'s Reply 15. Because the Court finds that Plaintiff is not entitled to consequential damages, and that Plaintiff's third cause of action is untimely, it does not embark upon an analysis of the Government's alternative argument.

10

Tar Creek Superfund Site.  Because Plaintiff seeks damages "for the cumulative effect of alleged breaches by the Government that were outside of the six-year statute of limitations period, [Plaintiff's] suit d[oes] not represent a continuing claim."  <u>Shoshone IV</u>, 672 F.3d at 1035 n.9 (citing <u>Brown Park</u>, 127 F.3d at 1457-58).  Accordingly, the Court grants the Government's motion to dismiss Plaintiff's third cause of action.

    IV.    <u>Conclusion</u>

For the reasons set forth above, the Government's motion for partial dismissal of Plaintiff's claims is GRANTED in part and DENIED in part.  Pursuant to Rule 12(a)(4), the Government shall file its answer within fourteen days of this opinion, on or before July 30, 2013.

    IT IS SO ORDERED.

                                          s/ Thomas C. Wheeler
                                          THOMAS C. WHEELER
                                          Judge