# In the United States Court of Federal Claims

No. 12-592L

(Filed: October 1, 2015)

**************************************

QUAPAW TRIBE OF OKLAHOMA,

       Plaintiff,

v.

THE UNITED STATES,

       Defendant.

**************************************

Indian Tribe Claims; Breach of Fiduciary Duty; Breach of Trust Obligations; Partial Summary Judgment; Binding Effect of Government-Sponsored Accounting Reports.

*Nancie G. Marzulla,* with whom were *Roger J. Marzulla,* Marzulla Law, LLC, Washington, D.C., *Stephen R. Ward* and *John L. Williams*, Conner & Winters, LLP, Tulsa, Oklahoma, Of Counsel, for Plaintiff.

*Stephen R. Terrell,* with whom were *John C. Cruden,* Assistant Attorney General, and *Peter K. Dykema*, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., *Kenneth Dalton, Shani N. Walker,* and *Karen Boyd,* U.S. Department of Interior, *Thomas Kearns* and *Rebecca Saltiel*, U.S. Department of the Treasury, Of Counsel, for Defendant.

### OPINION AND ORDER ON PLAINTIFF'S
### MOTION FOR PARTIAL SUMMARY JUDGMENT

WHEELER, Judge.

  This case involves the claims of the Quapaw Indian Tribe of Oklahoma for breach of fiduciary duty and breach of trust obligations. On April 6, 2015, the Quapaw Tribe filed a motion for partial summary judgment on the following three grounds: (1) that the Government is liable for annual educational payments of $1,000 from 1932 to the present under the Treaty of 1833; (2) that the Government is liable for $31,680.80 in unauthorized disbursements from the Quapaw Tribe's trust accounts, as found in the 1995 Tribal Trust Funds Reconciliation Project Report prepared by Arthur Andersen LLP; and (3) that the

Government is liable for $70,330.71 in transactions that should have been credited to the Quapaw Tribe's trust accounts but were not, as reported in the 2010 Quapaw Analysis.[1]

On May 28, 2015, the Government filed its opposition to Plaintiff's motion, asserting a number of legal and factual reasons why partial summary judgment should not be granted. On June 29, 2015, Plaintiff filed a reply in support of its motion, and on July 1, 2015, Plaintiff filed a corrected version of its reply, with leave of the Court. The parties submitted multiple exhibits in support of their positions, which the Court has considered. The Court also requested and received supplemental briefs from the parties on the question of whether the findings in the 2010 Quapaw Analysis and the 1995 Arthur Andersen Report are binding on the Government, or whether the Government may offer other evidence to rebut Plaintiff's claims regarding mismanagement of the trust accounts. Order, Aug. 12, 2015. Plaintiff filed the last of the supplemental briefs on September 25, 2015, and Plaintiff's motion is ready for decision. Oral argument is unnecessary.

The standard of review on a motion for summary judgment is well established. Summary judgment is appropriate when there is no genuine dispute as to any issue of material fact, and the movant is entitled to judgment as a matter of law. RCFC 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A fact is "material" if it might significantly alter the outcome of the case under the governing law. Anderson, 477 U.S. at 248. Summary judgment will not be granted if the "evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Id. at 248. The Court's function is not to weigh the evidence and determine the merits of the case presented, but to determine whether there is a genuine issue of material fact for trial. Id. at 249; see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

The Court will examine each of Plaintiff's three claims in turn below.

## I.   Educational Payments

The Treaty of May 13, 1833 between the United States and the Quapaw Indians contained terms under which the Quapaw Tribe would move to new lands and resolve past disputes with the Government. Among a host of terms describing what the Quapaw Tribe would receive, one provision provided for the United States to make an annual educational payment to the Quapaw Tribe as follows:

---

[1] The Quapaw Tribe filed its motion for partial summary judgment in both the present case and in Thomas Charles Bear et al. v. United States, No. 13-51X, a parallel Congressional Reference case. Because of the outcome of the motion explained herein, the Court finds it unnecessary to address any of the issues in a Congressional Reference context.

> The United States also agree to appropriate one thousand dollars per year for education purposes to be expended under the direction of the President of the United States; . . . the above appropriation for education purposes to be continued only as long as the President of the United States deems necessary for the best interests of the Indians.

Treaty of the Quapaw, May 13, 1833, 7 Stat. 424 at art. III.  From 1932 through 2015, despite inquiries and demands from the Quapaw Tribe, the United States did not make this annual treaty payment of $1,000, and the President has never deemed the payment unnecessary.  The Quapaw Tribe asserts that the Government's failure to meet its treaty responsibility is a breach of a fiduciary obligation.  The Quapaw Tribe claims damages of $1,000 per year from 1932 to 2015 ($83,000), plus investment income the funds would have earned had they been timely deposited.  The accounting review known as "the Quapaw Analysis," performed during 2004-2010, found no record that any educational payments required by the 1833 Treaty had been made from 1932 to the present.  See Quapaw Analysis at 103.

Defendant does not accept Plaintiff's educational payments claim, and has raised a number of defenses.  However, none of the defenses has any merit.

First, Defendant asserts that the Court lacks subject matter jurisdiction over this claim, because the Treaty of 1833 provides for discretionary payments and therefore is not a money-mandating statute under the Tucker Act, 28 U.S.C. § 1491, or the Indian Tucker Act, 28 U.S.C. § 1505.  According to Defendant, an "appropriation" is only a license from Congress "to incur obligations and to make payments from [the] Treasury for specified purposes."  Def.'s Opp. at 8 (citing 1 U.S. Government Accountability Office, Principles of Federal Appropriations Law 2-5 (3d ed. 2004)).  Defendant then states that an appropriation permits but does not mandate the payment of money.  Id. at 8-9.  Further, Defendant contends that the treaty language is discretionary, because it authorizes the President to discontinue the payments if he deems them "not in the best interests of the Indians."  Def.'s Opp. at 9 (citing Treaty with the Quapaw at art. III).

The Court will not employ a twisted interpretation of the 1833 Treaty to allow the Government to escape a promise it so clearly made.  The idea that Congress would *appropriate* funds for educational payments each year without actually *paying* the funds to the Tribe would make the Treaty obligation illusory and give the Tribe nothing.  Similarly, the fact that the President possessed a right he never exercised in 83 years does not change the outcome.  Reading the Treaty as the Quapaw Tribe would read it (or indeed as any reasonable person would read it), the Government has breached its promise to make annual educational payments, and should be held accountable.

3

Moreover, as Plaintiff points out, Defendant has already conceded that the Court has jurisdiction of this claim, and Defendant offers no explanation for now changing its position. In an earlier filing in this case made to support its motion for partial dismissal, Defendant stated "the United States acknowledges that plaintiff has pled a cause of action within the Tucker Act's waiver of sovereign immunity as to this limited claim [the educational payments claim]." Def.'s Mot. to Dismiss, Nov. 13, 2012, at 12. The Court relied on this statement in denying the Government's motion to dismiss. Quapaw Tribe of Okla. v. United States, 111 Fed. Cl. 725, 729 (2013).

Second, Defendant contends that the doctrine of claim preclusion bars Plaintiff's recovery of educational payments at least for the years 1932 through 1947. The Government relies upon a case filed by the Quapaw Tribe in 1947 under the Indian Claims Commission Act, and argues that Plaintiff "could have, and should have, brought its pre-Fiscal Year 1949 education annuity payment claims in that petition." Def.'s Opp. at 10. Defendant states that "[c]laim preclusion reaches not only those matters that were previously litigated and decided, it also bars subsequent litigation on matters that were never litigated but could have been advanced in the earlier suit." Id. at 11 (citing Sharp Kabushiki Kaisha v. Thinksharp, Inc., 448 F.3d 1368, 1370 (Fed. Cir. 2006)).

Plaintiff rebuts Defendant's claim preclusion defense by citing the actual claims made in the Indian Claims Commission case, and asserting that the issues presented there involved the valuation of land under different treaties, one dated August 24, 1818 (7 Stat. 176), and the other dated November 15, 1824 (7 Stat. 232). Quapaw Tribe of Okla. v. United States, 1 Ind. Cl. Comm. 469, 475 (1951). These claims were not based on the same set of transactional facts as the present case, and therefore the doctrine of claim preclusion would not apply. A 2011 case in this Court involving nearly identical facts is dispositive of Defendant's position. Round Valley Indian Tribes v. United States, 97 Fed. Cl. 500 (2011). There, in a comprehensive opinion, the Court rejected the Government's claim preclusion defense, holding that Round Valley's breach of trust claims had not been previously brought because they were not based on the same transactional facts. Id. at 515-16. Defendant's counsel in Round Valley was the same as in this case, yet Defendant did not even disclose or discuss Round Valley in its brief to the Court.

Third, Defendant asserts that Plaintiff's claims for educational payments is barred by the Court's six-year statute of limitations, 28 U.S.C. § 2501, to the extent that Plaintiff's claims pre-date September 11, 2006 (six years prior to the filing of the complaint). Def.'s Opp. at 14-18. Defendant states that the educational payments are not "trust funds" under the Consolidated Appropriations Act of 2012, providing that the statute of limitations would not begin to run until "an accounting of such funds from which the beneficiary can determine whether there has been a loss." Id. at 16-17 (quoting Pub. L. No. 112-74, 125

Stat. 786 (2011)).  If the Consolidated Appropriations Act does not apply, then the normal six-year statute of limitations would govern.

In response, Plaintiff contends that the educational payments claim did not accrue until the Quapaw Tribe received an accounting identifying this claim in 2010.  Plaintiff states that the educational payments are trust funds because they were to be spent "at the direction of the President."  Pl.'s Reply at 11 (quoting Treaty with the Quapaw at art. III). Whenever the Government manages treaty payments for Tribes, it acts as a trustee and is subject to "the most exacting fiduciary standards."  Seminole Nation v. United States, 316 U.S. 286, 297 (1942).  The Federal Circuit has held that the phrase "losses to or mismanagement of trust funds" from the Consolidated Appropriations Act includes circumstances where money was due but not deposited in tribal trust accounts.  Shoshone Indian Tribe of the Wind River Reservation v. United States, 364 F.3d 1339, 1349-51 (Fed. Cir. 2004).  Since the educational payments were to be made to the Quapaw Tribe in general, not to individual persons, they are fairly and reasonably classified as "trust funds." Thus, the Court agrees with Plaintiff that the educational payments claim is timely because did not accrue until the 2010 accounting.

Last, Defendant argues that genuine issues of material fact preclude the granting of summary judgment.  Def.'s Opp. at 18.  However, by citing other examples where the Government has budgeted large funds for Indian Tribes, including education, Defendant cannot thereby show that it satisfied the specific promise to make annual education payments in the Treaty of 1833.  The Government's Rule 30(b)(6) deponent, Paul Yates, conceded that these payments have not been made since 1932.  Yates Dep. 138:2-21, Dec. 4, 2014.

II.     Unauthorized Disbursements

As a second basis for partial summary judgment, Plaintiff asserts that the congressionally authorized Tribal Trust Funds Reconciliation, which culminated in a December 31, 1995 report by Arthur Andersen LLP, identified three disbursements from the Quapaw Tribe's trust accounts, totaling $31,680.80, that were not authorized.  Arthur Andersen Report at 9.  The 2010 Quapaw Analysis confirmed this total, and also calculated that, had those funds been kept in the trust account, they would have accumulated $903.00 in statutorily required interest as of September 30, 1992.

In the early 1990s, the U.S. Bureau of Indian Affairs hired Arthur Andersen LLP "to reconstruct historical transactions, to the extent practicable, for all years for which records are available for all Tribal Trust accounts managed by the Bureau."  Id. at 1. Congress required the Andersen Report "in an effort to correct longstanding problems in accounting for tribal trust funds by BIA [Bureau of Indian Affairs].  The report took five

years to research and draft, and cost the United States $21 million to complete." <u>Osage Tribe of Okla. v. United States</u>, 93 Fed. Cl. 1, 26 (2010).  The three unauthorized disbursements totaling $31,680.80 for the Quapaw Tribe were made payable to the Tribe "in care of Superintendent or third party (Bank) and did not have both Tribal and other governmental signed authorization."  Arthur Andersen Report at 9.  The Government's Rule 30(b)(6) deponent for this topic testified that these transactions are "lacking certain approval documents."  Chavarria Dep. 190:18-19, Nov. 18, 2014.

In the Quapaw Analysis, Quapaw Information Systems, Inc. contracted with an independent accountant, Gerding, Korte & Chitwood, P.C., to review the Arthur Andersen Report and identify "disbursements that did not have both Tribal and governmental authorization" and "interest adjustments or variances."  Quapaw Analysis at 158-64. Gerding, Korte & Chitwood confirmed that $31,680.80 in disbursements were made without proper authorization.  <u>Id.</u> at 164.  This firm also calculated that interest as of September 30, 1992 on these disbursements was $903.00.  <u>Id.</u>

Defendant opposes the unauthorized disbursements claim on statute of limitations grounds, and because genuine issues of material facts exist.  The Court rejects the statute of limitations defense because the Government apparently did not accept the findings of the 1995 Arthur Andersen Report, and compelled the Quapaw Tribe to file suit in Oklahoma.  <u>Quapaw Tribe of Okla. v. Dep't of Interior</u>, No. 02-cv-129 (N.D. Okla. filed Feb. 14, 2002).  The parties settled that case in 2004 on terms that resulted in the preparation of the Quapaw Analysis, accepted by the Department of Interior in November 2010.  As noted above, the Quapaw Analysis addressed the question of the unauthorized disbursements, and reached the same conclusion as the 1995 Arthur Andersen Report.  The present lawsuit is timely because it was filed within six years after the Government's acceptance of the Quapaw Analysis.

The Court also rejects the Government's attempt to take issue with the Quapaw Analysis and the Arthur Andersen Report.  These accounting endeavors were undertaken with the full support and cooperation of the United States.  There comes a point when finality must be applied.  If there are newly discovered documents that cause the Government to question the conclusions reached in the Quapaw Analysis or the Arthur Andersen report, the Government should have produced those documents earlier.  The public's interest in ending decades-old disputes with Native American Tribes outweighs the continued expenditure of time and resources to account for every last nickel.  Allowing the Government to continue opposing the Arthur Andersen Report and the Quapaw Analysis is contrary to the purpose and spirit of the legislation and settlement agreement that caused them to occur.

III.     Transactions That Should Have Been Credited

As its third basis for partial summary judgment, Plaintiff claims $70,330.71 in unauthorized transactions. Pl.'s Mot. at 14-15. The Quapaw Analysis refers to these amounts as "transactions posted to the Tribal Trust Accounts and transactions in which monies should have been received, or were received, but that cannot be verified (as posted) to the Tribal Trust Accounts. . . . The total dollar amounts unaccounted for before interest accrual are $70,331." Quapaw Analysis at 103. The Government has stated in discovery that it has no information regarding these transactions. See Req. for Admission No. 15. The Government updated its discovery response on October 24, 2014 to say that it now has information to contest these amounts, i.e., eight ledger sheets for account Q-32. Def.'s Opp. at 29.

As noted in Section II above, finality must attach to the Quapaw Analysis. The Court will not permit Defendant to impeach this detailed report, when it could have produced documents or raised its concerns at a much earlier time. The Quapaw Analysis is binding upon the United States.

Conclusion

Based upon the foregoing, the Court GRANTS Plaintiff's motion for partial summary judgment on its educational payments claim ($83,000), its unauthorized disbursements claim ($31,680.80), and its unauthorized transactions claim ($70,331), together with investment income that would have been earned if these amounts had been timely credited to the Quapaw Tribe's account.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge