# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| Grace M. Goodeagle et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 12-431L |
| | ) | |
| v. | ) | Hon. Thomas C. Wheeler |
| | ) | |
| United States, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| Quapaw Tribe of Oklahoma (O-Gah-Pah), | ) | |
| a federally recognized Indian nation, | ) | No. 12-592L |
| | ) | |
| Plaintiff, | ) | Hon. Thomas C. Wheeler |
| v. | ) | |
| | ) | |
| United States, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| Thomas Charles Bear et al., | ) | |
| | ) | |
| Claimants, | ) | No. 13-51X |
| | ) | |
| v. | ) | Hon. Thomas C. Wheeler |
| | ) | |
| United States, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS/CLAIMANTS' PRETRIAL MEMORANDUM

**Table of Contents**

Table of Authorities ........................................................................................................ v

Table of Exhibits........................................................................................................... viii

I.     Facts concerning the Quapaw's homeland ............................................................ 2

II.    Facts the Quapaw will prove in support of their Tucker Act legal claims.............. 5

       A.     Facts concerning *Goodeagle* claims by individual members of the Tribe.... 6

             1.     Fact: BIA failed to collect $2,843,902.77 in lease payments due for town lot leases ............................................................ 7

             2.     Fact: BIA failed to collect lease payments due for agricultural leases for 13 sample allotments........................................... 9

             3.     Fact: BIA failed to collect $1,122,623 in chat royalties from the Pioneer chat pile, a calculation that can be extrapolated to determine the amount of uncollected trust funds from other Quapaw chat piles .......................................................... 10

             4.     Fact:  the Government failed to collect $8,654,370.79 in payment for chat taken from the Sooner, Ottawa, Blue Goose, and Pioneer chat piles...................................................................... 12

             5.     Fact: the Government improperly allowed conveyances of interests in the Sooner Chat Pile out of restricted status depriving certain tribal members of ownership interests in the Sooner chat pile worth $1,738,702.93 ................................................. 13

             6.     Fact: the Government failed to collect $3,479,622 in mining royalties ....................................................................... 14

             7.     Fact: the Government failed to collect $353,365.44 for rights-of-way across individual allotments .................................... 15

       B.     Facts concerning the Quapaw Tribe's claims ............................................ 16

             1.     Fact: the Government failed to collect $15,878.28 for agricultural leases on the Tribe's Industrial Park property................................. 17

             2.     Fact: the Government failed to collect $1,720 (without investment earnings) for a 30-year right-of-way across the Industrial Park .................................................................. 18

             3.     Fact: the Government prevented the Tribe from receiving $2.6 million under the Land Buy-Back program, within the six-year statute of limitations ....................................................... 18

4.      Fact: the Government took for itself, and failed to pay to the Tribe $257,399.97 left over from the Indian Claims Commission judgment ................................................................................... 19

III.    Facts the Quapaw will prove in support of their Congressional Reference equitable claims ................................................................................ 22

A.      Facts concerning the Tribe's equitable claims ............................................ 23

1.      Fact: the Government's uncompensated conveyance of the Catholic Forty caused the Tribe a loss of $110,535.22 ................... 23

2.      Fact: the Government charged less than fair market value for agricultural leases on the Tribe's Industrial Park land, resulting in losses of $503,191 ................................................................... 25

3.      Fact: the contamination and subsidence from the Government-authorized mining program destroyed the natural resources on 40 square miles of the Quapaw's reservation, a loss of $740,929,000. .................................................................................. 27

B.      Facts concerning Quapaw Individual claims under the Congressional Reference ..................................................................................................... 29

1.      Fact: the Government's mismanagement of mining wastes deposited on, and failure to charge fair market value for, town lots resulted in losses of $18,219,942.61 ......................................... 29

2.      Fact: the Government's mismanagement of mining waste and failure to charge fair market rents resulted in a loss of $29,670,922 from the Quapaw's agricultural lands ......................... 31

3.      Fact: the Government issued mining leases on Quapaw lands for below-market royalties, and failed to obtain any royalties for germanium and sulfuric acid, resulting in losses of $37,061,875 to the Quapaw ................................................................................. 35

4.      Fact: the Government leased and sold chat at below-market prices, resulting in losses of $13,237,034 ......................................... 38

5.      Fact: BIA failed to collect $1,731,053 (without investment earnings) for chat taken from the Ottowa chat pile without compensation between 1988 and 2004 ............................................. 40

IV.     Facts the Quapaw will prove in support of the investment earnings value of each claim .................................................................................................. 40

V.      Applicable legal principles .................................................................................. 41

A.      The Government has a fiduciary duty to properly manage the Quapaw's trust funds and trust assets ......................................................................... 43

B.    Congress has given the Government, as trustee, comprehensive
      supervision and control over the Quapaw's restricted land and mineral
      assets ........................................................................................................... 44

C.    The Secretary of Interior has adopted regulations comprehensively
      governing the leasing of restricted Quapaw lands for agriculture, town
      lots, and mining ........................................................................................... 45

D.    The Government's control and management of the Quapaw's trust funds
      and resources, as authorized by these statutes and regulations, goes far
      beyond a bare minimal level and therefore can be fairly interpreted as
      mandating compensation for a breach: ......................................................... 47

E.    The Government has a money-mandating fiduciary duty to collect
      royalties and enforce mineral leases on Quapaw lands ................................ 47

F.    The Government has a money-mandating duty to collect royalties and
      enforce lease provisions of chat leases it issues .......................................... 49

G.    The Government has a money-mandating fiduciary duty to collect rents
      and enforce leases on the Quapaw's agricultural lands ............................... 50

H.    The Government has a money-mandating fiduciary duty under the Fifth
      Amendment to collect compensation for rights-of-way granted on
      Quapaw lands and to obtain compensation for conveying title to the
      Catholic Forty .............................................................................................. 54

I.    The Government has a money-mandating duty to collect rents for rights-
      of-way or other easements on Quapaw lands ............................................... 55

J.    The Government has a money-mandating fiduciary duty to collect rents
      under town lot leases ..................................................................................... 57

K.    The Indian Land Consolidation Act and the federal Land Buy Back
      Program, and their implementing regulations and other foundational
      documents establish a fiduciary, money-mandating duty, which the
      Government has breached .............................................................................. 58

L.    The Government has a money-mandating duty to conserve the
      Quapaw's natural resources .......................................................................... 59

M.    The Quapaw Analysis is binding on the Government ................................... 61

**Table of Authorities**

**Cases**

*Bear v. United States*,
 112 Fed. Cl. 480 (2013) ............................................................ 42

*Bigelow v. RKO Radio Pictures*,
 327 U.S. 251 (1946) ................................................................ 42

*Caroline Hunt Trust Estate v. United States*,
 65 Fed. Cl. 271 (2005) ......................................................... 22, 42

*Cherokee Nation v. Southern Kansas R. Co.*,
 135 U.S. 641 (1890) ................................................................ 54

*Cobell v. Norton*,
 240 F.3d 1081 (D.C. Cir. 2001) ............................................ 42, 60

*Cole v. Asarco, Inc.*,
 256 F.R.D. 690 (N.D. Okla. 2009) ............................................. 49

*Confederated Tribes of the Warm Springs Reservation of Or. v. United States*,
 248 F.3d 1365 (Fed. Cir. 2001) ............................................. 6, 42

*Day & Zimmermann Servs. v. United States*,
 38 Fed. Cl. 591 (2006) .......................................................... 22

*Fort Berthold Reservation v. United States*,
 182 Ct. Cl. 543 (1968) ...................................................... 42, 54, 55

*Goodeagle v. United States*,
 111 Fed. Cl. 716 (2013) ....................................................... 2, 61

*Goodeagle v. United States*,
 122 Fed. Cl. 292 (2015) .......................................................... 40

*Holder v. Gold Field Mining Corp.*,
 506 F. Supp. 2d 792 (N.D. Okla. 2007) ...................................... 49

*Int'l Union (UAW) v. NLRB*,
 459 F.2d 1329 (D.C. Cir. 1972) ................................................ 22

*Jicarilla Apache Nation v. United States*,
 100 Fed. Cl. 726 (2011) .......................................................... 42

*Matter of Elliott*, IP OK, 246 P 93  246 P 93
   (U.S. Dep't of Interior Office of Hearings & Appeals)...........................................42, 49

*Menominee Indian Tribe of Wis. v. United States*,
   39 Fed. Cl. 441 (1997) ............................................................................................42

*Montana v. Blackfeet Tribe of Indians*,
   471 U.S. 759 (1985) .................................................................................................60

*Osage Nation v. United States*,
   57 Fed. Cl. 392 (2003) .............................................................................................42

*Osage Tribe of Indians of Okla. v. United States*,
   72 Fed. Cl. 629 (2006) .............................................................................................42

*Osage Tribe of Indians of Okla. v. United States*,
   93 Fed. Cl. 1 (2010) ...........................................................................................42, 45

*Osage Tribe of Indians of Okla. v. United States*,
   96 Fed. Cl. 390 (2010) .............................................................................................42

*Quapaw Tribe of Okla. v. United States*,
   111 Fed. Cl. 725 (2013) .............................................................................................5

*Quapaw Tribe of Okla. v. United States*,
   120 Fed. Cl. 612 (2015) .....................................................................................21, 22

*Quapaw Tribe of Okla. v. United States*,
   123 Fed. Cl. 673 (2015) .....................................................................................1, 7, 61

*Shoshone Indian Tribe of Wind River Reservation v. United States*,
   364 F.3d 1339 (Fed. Cir. 2004) ........................................................................passim

*Shoshone Indian Tribe of Wind River Reservation v. United States*,
   52 Fed. Cl. 614 (2002) .............................................................................................50

*United States v. Mitchell*,
   463 U.S. 206 (1983).............................................................................................43, 60

*United States v. Noble*,
   273 U.S.  74 (1915).............................................................................................43, 45

*White Mountain Apache Tribe v. United States*,
   537 U.S. 465 (2003).........................................................................................41, 43, 47

**Statutes**

25 U.S.C. 393 ........................................................................................................ 52

25 U.S.C. 394 ........................................................................................................ 52

25 U.S.C. 395 ........................................................................................................ 51

25 U.S.C. 397 ................................................................................................... 50, 53

25 U.S.C. 402, 28 ................................................................................................. 51

25 U.S.C. 403, 36 ................................................................................................. 52

25 U.S.C. § 162a(d)(8) ..................................................................................... 44, 60

25 U.S.C. § 164 ..................................................................................................... 21

25 U.S.C. § 2205(c) .............................................................................................. 59

25 U.S.C. § 2218 ................................................................................................... 45

25 U.S.C. § 912 ..................................................................................................... 20

25 U.S.C. §§ 161a, 161b, and 162a .................................................................... 48

25 U.S.C. §§ 2201-2221 .......................................................................... 19, 58, 59

25 U.S.C. §§ 391-416i ................................................................................... 11, 50

25 U.S.C. §§ 396, 415-415d ................................................................................. 49

25 U.S.C. §§ 161, 161a, and 162a ...................................................................... 41

Pub. L. No. 111-291, 124 Stat. 3064 .................................................................. 59

Pub. L. No. 111-291 .............................................................................................. 59

Pub. L. No. 83-663 ................................................................................................ 20

**Regulations**

25 C.F.R. Part 162 ................................................................................................ 34

25 C.F.R. § 171 (1938) .............................................................................. 53, 54, 60

25 C.F.R. § 211.40 .......................................................................................... 48

25 C.F.R. § 215 ......................................................................................... 48, 49

25 C.F.R. § 162.108 ....................................................................................... 57

40 C.F.R. § 278.1 ........................................................................................... 11

72 Fed. Reg. 39,331 (July 18, 2007) ............................................................. 11

80 Fed. Reg. 76,312 (Dec. 8, 2015) .............................................................. 28

Quapaw-Mineral Lease,
    1934 WL 61744 (Solicitor Gen. Op. Aug. 21, 1934) ................................. 38

80 Fed. Reg. 76,312 (Dec. 8, 2015) .............................................................. 28

## Other Authorities

RESTATEMENT (SECOND) OF TRUSTS § 175 (1959) ........................................... 60

RESTATEMENT (SECOND) OF TRUSTS § 181 (1959) ........................................... 60

## Table of Exhibits

Exhibit 1: Summary of the Government's duties and obligations related to the Quapaw

Appendix: Statutes and Regulations

## PLAINTIFFS/CLAIMANTS' PRETRIAL MEMORANDUM

Plaintiffs/Claimants, (collectively "the Quapaw"), provide this memorandum describing the contested facts they expect to prove at trial and the conclusions of law they expect will be established at the trial to commence on October 11, 2016, along with an appendix containing the applicable laws and regulations relevant to these three coordinated cases.[1] The trial to commence on October 11, 2016 will be preceded by a site visit on September 20, 2016 and testimony to be taken in Miami, Oklahoma on September 21–22, 2016.[2]

The Court's rulings on the four pending motions for partial summary judgment (one by the Quapaw and three by the Government) may limit the number of issues of fact and law to be addressed at trial.[3] The Court has already ruled in favor of the Quapaw on three other claims, and those issues will not be revisited in this trial.[4]

Although the three coordinated cases are being tried together, the Court has ruled that some of the Quapaw's claims are within the Court's Tucker Act jurisdiction

---

[1] Pretrial Order at 1–2 (Nov. 5, 2015) (*Quapaw Tribe* Doc. 128).

[2] Joint Status Report (Aug. 21, 2016) (*Quapaw Tribe* Doc. 163).

[3] Pls./Claimants' Mot. for Partial Summ. J. on Remaining Quapaw Analysis Claims (June 27, 2016) (*Quapaw Tribe* Doc. 153; *Goodeagle* Doc. 147; *Bear* Doc. 134); Def.'s Mot. for Partial Summ. J. (July 15, 2016) (*Quapaw Tribe* Doc. 161); Def.'s Mot. for Partial Summ. J. (July 15, 2016) (*Goodeagle* Doc. 155); Def.'s Mot. for Partial Summ. J. (July 15, 2016) (*Bear* Doc. 142).

[4] *Quapaw Tribe of Okla. v. United States*, 123 Fed. Cl. 673, 678 (2015) (*Quapaw Tribe* Doc. 119) ("The Quapaw Analysis is binding upon the United States" and "[t]he Court will not permit the United States to impeach this detailed report, when it could have produced documents or raised its concerns at a much earlier time."); *see also id.* (granting Plaintiff's motion on its educational payments claim ($83,000), its unauthorized disbursement claim ($31,680.80), and its unauthorized transactions claim ($70,331), with investment earnings).

(requiring a final judgment after trial), while the other claims will result in a report to the House of Representatives in exercise of this Court's Congressional Reference jurisdiction.[5]

The parties continue to negotiate stipulations of fact that would limit the contested factual issues in this case.

## I.      Facts concerning the Quapaw's homeland

The Quapaw homeland serves an important and unique role in the Tribe's culture, and their present reservation, consisting of 52,890 acres in northeast Oklahoma, has come to replace their aboriginal lands in present-day Arkansas.[6] In addition to the history presented in the Quapaw Analysis,[7] the Quapaw will present the testimony of the three leading scholars on the history of the Quapaw people:  Dr. David Baird, Howard A. White Professor of History and Dean Emeritus of Seaver College at Pepperdine University, and author of the definitive history of the Quapaw;[8] Hon. Morris Arnold, a federal judge serving on the U.S. Court of Appeals for the Eighth Circuit, who is also a well-known historian of the Quapaw Tribe;[9] and Dr. Douglas Littlefield, Principal of Littlefield Historical Research with over thirty years of historical research experience,

---

[5] *Goodeagle v. United States*, 111 Fed. Cl. 716, 721–22 (2013) (*Goodeagle* Doc. 27).
[6] Expert Rep. of Dr. W. David Baird at 5 (Apr. 13, 2016) (*Quapaw Tribe* Doc. 145-5).
[7] Quapaw Analysis at 4–6 (2010) (*Quapaw Tribe* Doc. 14-1).
[8] *See* W. David Baird, *The Quapaw Indians: A History of the Downstream People* (Normal: University of Oklahoma Press, 1980).
[9] *See, e.g.*, Morris S. Arnold, *The Rumble of a Distant Drum: Quapaws and Old World Newcomers, 1673-1804* (Fayetteville: University of Arkansas, 2000); *see also* Resume, Expert Rep. of Honorable Morris Arnold (Apr. 13, 2016) (*Quapaw Tribe* Doc. 145-4).

including extensive research and study of the Quapaw.[10] Chairman John Berrey will also testify about the present-day Quapaw Tribe.

A.      Dr. Baird will testify that the Quapaw have a unique story that begins at least 350 years ago and reflects a people who were faithful to the land that nurtured and explained them. Over time, the Quapaws were primarily an agricultural people, who supplemented their diet with vegetables, fruits, and meat gathered from the forests and prairies. Their land provided them sustenance, not just as a source of food but also providing a source of income. Both before and after removal to Oklahoma, the Quapaws have used the land to earn a living by agriculture, hunting, gathering, and mining. Spiritually, the land serves as the primal well-spring of their very being. That idea was the worldview of the Quapaws three and a half centuries ago, it was their worldview as they were forced to move from their natal land in Arkansas to a new domain in Indian Territory in 1834, it was also their world view in the midst of a mining bonanza in the 1920s, and it remains the worldview of the members of the Tribe today, which is now based in northeastern Oklahoma.[11]

The Quapaw have never forgotten that the land connects them to the life force that gave them identity as a people, and, in the twentieth century, as a Quapaw. For that reason, the Quapaws have always worked hard to preserve their land base that continues in their possession, as individuals and as a tribe.[12]

---

[10] Expert Rep. of Dr. Douglas Littlefield at 19 (Apr. 13, 2016) (*Quapaw Tribe* Doc. 145-11).

[11] Baird Rep. at 1.

[12] Baird Rep. at 13.

B.      Judge Arnold, who has authored numerous articles on the Quapaw people, will testify that "[t]he tribe's history as a sovereign nation, including its relationships with other governments, demonstrates the importance of the tribe's ability as a government to exercise its sovereignty over its tribal land."[13]

Tracing their successful dealings with the French, the Spanish and the English as each nation in turn took control of the Quapaw's Arkansas homeland, Judge Arnold will testify that the Quapaw could not successfully resist the American tide of settlement and, in 1833, finally agreed by treaty to relinquish their lands to the United States in return for their present location in Oklahoma:

> After their cruel diaspora, the tribe ended up on a reserve in Indian Territory and in 1853 an American army officer said that only about 150 tribal members survived. In the late nineteenth century, there were, incredibly, only 40 members of the home band living on the reservation in Oklahoma and the United States had tried to get them to combine with the Osages and altogether cease being a separate people. By heroic efforts, however, including recruiting some of the *métis* people alluded to before, who had been left behind in Arkansas, the Quapaws somehow managed to cobble together a roster sufficiently large to convince the United States that they deserved to retain their tribal recognition. Today, the Quapaw Tribe of Oklahoma, with a membership of almost 5,000, proudly celebrates both its native and French heritage.[14]

C.      Dr. Littlefield will testify to the economic uses the Quapaw have historically made of their reservation lands for agriculture, town lots, and mining, and how the Government's administration of the Quapaw's trust lands went so terribly wrong:

> [V]ery little had been done to control Quapaw mineral lease abuses such as

---

[13] J. Arnold Rep. at 1.
[14] J. Arnold Rep. at 14.

assignments, endless lease extensions, renewals, and pyramiding. Indeed, such restrictions had been proposed but defeated by mining interests and even some of the Quapaws themselves. It was that lack of regulation and federal oversight that had cost many Quapaws considerable sums of money while many lessees took advantage of the circumstances to enhance their own wealth.[15]

D.   John Berrey, Chairman of the Quapaw Tribe since 2002,[16] will explain the

significance the Quapaw attach to their lands today, economically, spiritually, and

culturally, how their land is only homeland the Tribe has, and how it cannot be replaced.

He will describe how the Government's mismanagement of the Tribe's trust lands has

almost totally destroyed the heritage the Quapaw hoped to pass on to future generations,

and his quest to obtain some compensation for the harm done to the Quapaw's land base,

starting with the Tribe's suit for an accounting in 2002, culminating with the six long

years of research and preparation of the Quapaw Analysis. The Quapaw Analysis forms

the basis of the claims the Tribe and its members now bring to trial in this Court.

## II.   Facts the Quapaw will prove in support of their Tucker Act legal claims

The Court has determined that the Quapaw's claims based on the Government's

failure to collect, deposit or properly manage trust funds did not accrue until 2010, when

the Government provided the Quapaw an accounting in the form of the Quapaw

Analysis—and those claims are therefore within the Court's jurisdiction as within the

Tucker Act's six-year statute of limitations.[17] The Quapaw Analysis details the factual

basis for the Government's liability on three of the individual tribal member claims (town

---

[15] Littlefield Rep. at 67–68.

[16] Quapaw Analysis at iv.

[17] *Quapaw Tribe of Okla. v. United States*, 111 Fed. Cl. 725, 732–33 (2013) (*Quapaw Tribe* Doc. 23).

lot, agricultural leases and chat leases), and on three of the Tribe's claims (agricultural leases and rights-of-way on the Industrial Park property, and Indian Claims Commission (ICC) judgment funds not paid to tribal members).

In addition, the individual tribal members assert Tucker Act claims for mining royalties and rights-of-way the Government did not collect, which could not be documented in the Quapaw Analysis because the Government failed to provide the requested documents to the Project Team.[18] Because the facts concerning each of these claims establish liability, the Tribe's burden of proving damages is reduced to providing the Court a reasonable estimate, based on available records.[19]

A. **Facts concerning *Goodeagle* claims by individual members of the Tribe**

The Quapaw Analysis shows that as a result of the Government's failure to collect amounts due on actual town lot, agricultural, and chat leases on a sampling of thirteen Quapaw allotments, the tribal owners suffered trust fund losses in these principal amounts (without investment earnings):

- Town lot lease losses $2,843,902.77

- Agricultural lease losses To be determined at trial

- Chat lease losses

    Pioneer chat pile only $1,122,623

    Sooner, Ottawa, Blue Goose,
    Pioneer chat piles $8,654,370.79

---

[18] Quapaw Analysis at 30 ("[T]he federal agencies responsible for trust records maintenance never provided any mineral leases for the chosen individual allotments on the Quapaw Reservation.").

[19] *Confederated Tribes of the Warm Springs Reservation of Or. v. United States*, 248 F.3d 1365, 1374 (Fed. Cir. 2001).

|  | |
|---|---|
| Conveyance of the Sooner chat pile interest without compensation | $1,738,702.93 |

The Quapaw will prove two additional claims that were not determined in the

Quapaw Analysis because the Government failed to provide adequate documentation:

- Mining royalty losses                    $3,479,622

- Rights-of-way                              $353,365.44

The Quapaw Analysis also includes a calculation of interest, but this Court has

held that the Quapaw are not entitled to that interest but rather to the earnings they would

have received if the sums had been invested by BIA.[20] The Quapaw will therefore present

expert testimony at trial on the correct amount of investment earnings due in addition to

these principal sums. The Quapaw Analysis anticipates that the sampling of town lot

losses for 948 lots, and the sampling of one chat pile (Pioneer) provide a metric that can

be extrapolated to calculate total trust fund losses on all Quapaw town lot and chat

leases.[21]

### 1.    Fact: BIA failed to collect $2,843,902.77 in lease payments due for town lot leases

The Quapaw Analysis states that to accommodate the mining boom of the early

1900s town lots in several new towns were platted on Quapaw lands for miners' houses,

businesses, and mill sites. In 1918, the Indian Office (later the BIA) took over town lot

leasing activities.[22] Exercising its control as trustee of these restricted Quapaw lands, the

Quapaw Agency of BIA issued annual leases, in the form of town lot permits to miners,

---

[20] *Quapaw Tribe of Okla.*, 123 Fed. Cl. at 678 (*Quapaw Tribe* Doc. 119).
[21] Quapaw Analysis at 128–30.
[22] Quapaw Analysis, TribalTrustAccount_ReferenceDocs, at Pic. 54.

mining companies and the businesses that supported their settlements:

> The amount of rent BIA set for each lot varied depending on the location and the types of buildings on the lot.[23] A 1928 report states that 7,200 of the 14,500 lots were rented to "storekeepers, mine workers, and others," and rent ranged from $6 to $180 per year.[24] A 1943 letter from a field aid refers to a map of the Picher Mining District showing all subdivisions in the district and states that 50% of 8,092 "sub-divided" lots (4,046) were leased at the time.[25]

The Quapaw Analysis reports that originally there were 8,092 town lots "in the mining district," none of which were recorded.[26] Most lots were on Indian allotments and made up the towns of Cardin, Century, Commerce, Douthat, Hockerville, Picher, and Tar River.[27] By 1928 there were 14,500 town lots on trust allotments.[28]

The documentary evidence in the Quapaw Analysis data base proves that BIA failed to collect even 50% of the rent due on these town lots, as confirmed by a 1926 BIA report stating:

> The matter of collection of delinquent rentals has been receiving attention of this office since April 1924. Very little progress was made during the calendar year 1924. However, during the calendar year of 1925, through increased activity and a more intimate and personal knowledge and attention given this matter, we have increased the collection at approximately 50% . . . There are ". . . over 14,000 town lots in the various towns . . . however, approximately half of the lots are covered by chat piles, sludge ponds and other mining activities . . . ."[29]

In a 1942 letter the Superintendent of the Quapaw Agency further stated that

---

[23] Quapaw Analysis, MiscDocs_reBIA, at p. 42.
[24] Quapaw Analysis, MiscDocs_reBIA, at p. 42.
[25] Quapaw Analysis, Town_Lot_ReferenceDocs, at Pic. 13.
[26] Quapaw Analysis, TribalTrustAccount_ReferenceDocs, at Pic. 55.
[27] Quapaw Analysis, TribalTrustAccount_ReferenceDocs, at Pic. 54.
[28] Quapaw Analysis at 94.
[29] Ltr. from Superintendent J.L. Suffecool to Commissioner of Indian Affairs (January 11, 1926), QG04AFW0074705– QG04AFW0074706.

the town lot problems have "no parallel...due to lack of personnel, hundreds of thousands of dollars in rents have been lost to the Indians owning the lands on which these towns are located . . . .[30]

And a 1953 annual report to the Commissioner of Indian Affairs admits that "at no time prior to 1947 was the Department in a position to collect for more than 50% of the lots on which rent was due, due to insufficient personnel . . . ."[31]

To determine the amount of trust funds BIA had failed to collect from town lot leases over the years, the Quapaw Analysis team selected the Slim Jim allotment, which had 948 town lots, as a representative sample of the 14,500 town lots located on Quapaw lands,[32] then determined the lost rent for these 948 sample town lots. Based on the documents in the Quapaw Analysis data base, the Quapaw will prove a reasonable estimate of the number of lots under lease each year from 1922 to 2006, the total rent due on those lots, and the total rent collected. The difference between the rent due and the rent collected is $2,843,902.77 (without investment earnings). The Court should enter judgment for the Quapaw town lot owners in that amount.

### 2. Fact: BIA failed to collect lease payments due for agricultural leases for 13 sample allotments

The Quapaw Analysis examined actual lease files for 13 individual sample allotments to determine whether there was mismanagement on compliance with the lease terms, in particular regarding collections.[33] The QIS team chose to do a sample review of

---

[30] Ltr. from Superintendent H.A. Andrews to Office of Indian Affairs (Nov. 23, 1942).
[31] Annual Report to Commissioner of Indian Affairs (1953), QG04DOI0134702–QG04DOI0134705.
[32] Quapaw Analysis at 128–130.
[33] Quapaw Analysis at 50–93.

lease life-cycles between 1993 and 2004 and the two years following 2004.[34] The QIS

team reconstructed 165 actual leases and three revocable permits, making a diligent

search for appraisals, compliance reports and payment histories related to these leases.[35]

Among the Quapaw Analysis findings on these actual leases were that the Government

failed to collect rent from agricultural leases when due,[36] failed to collect interest on

delinquent payments, and failed to enforce lease terms requiring improvements. To

calculate historical damages beyond the 1993 to 2006 lease life-cycles, the QIS Team

extrapolated revenue calculation to the thirteen allotments from 1897 through 2006.[37]

Where actual collections were made on these leases, the amounts were subtracted

from the damages figure.[38] Of the total damages figure reported by the Quapaw Analysis

for agricultural leases, a portion is comprised of noncollection of leases, and the total

damage figure will be determined at trial. Although the Quapaw Analysis found evidence

of noncollection it could not quantify the amount. These are trust fund claims with

delayed accrual under the Appropriations Act.[39]

> **3.      Fact: BIA failed to collect $1,122,623 in chat royalties from the Pioneer chat pile, a calculation that can be extrapolated to determine the amount of uncollected trust funds from other Quapaw chat piles**

Chat is a valuable mining by-product, defined by EPA regulation as "waste

---

[34] Quapaw Analysis at 51.

[35] Quapaw Analysis at 51.

[36] *E.g.*, Quapaw Analysis at 53, 57–58, 59–62, 67–69.

[37] Quapaw Analysis at 121–27; *see also id.* at Folder of Spreadsheet Data by Allotment.

[38] Quapaw Analysis at 127; *see also id.* at Folder of Spreadsheet Data by Allotment.

[39] *The Shoshone Indian Tribe of Wind River Reservation v. United States*, 364 F.3d 1339, 1350–51 (Fed. Cir. 2004).

material that was formed in the course of milling operations employed to recover lead and zinc from metal-bearing ore minerals in the Tri–State Mining District of Southwest Missouri, Southeast Kansas and Northeast Oklahoma."[40] EPA regulations allow the profitable use of chat in (A) cement or concrete projects; and (B) transportation construction projects (including transportation construction projects involving the use of asphalt) that are carried out, in whole or in part, using federal funds.[41] On the Quapaw reservation, the United States has ultimate management and control over all aspects of the leasing and sale of chat, including collecting all payments owed to the Quapaw—and then as middleman sending the proper amount of royalty payments and bonus payments to the chat owners.[42]

To determine if the Government had collected and the Quapaw had received all of the compensation they were due for the lease or sale of chat, the Quapaw Analysis team selected the Pioneer chat pile, which is located on the Francis Quapaw Goodeagle allotment, and examined BIA records of chat sales over a 30-year period from 1952–1982.[43] The Quapaw Analysis team determined, based on the available records, that BIA had failed to collect payment for all chat removed from the Pioneer pile while it was under lease during the thirty years studied.

The Quapaw's expert witness, Stephen Jay, a certified public accountant, will testify as to how the Quapaw Analysis team calculated the amounts that the BIA should

---

[40] 40 C.F.R. § 278.1.
[41] Criteria for the Safe and Environmentally Protective Use of Granular Mine Tailings Known as "Chat," 72 Fed. Reg. 39,331 (July 18, 2007).
[42] 25 U.S.C. §§ 391–416i.
[43] Quapaw Analysis at 131–32.

have collected but did not collect for Pioneer pile chat:

> The initial step in the computation of the loss was to estimate a minimum amount of chat that was removed from the Pioneer Chat pile for the Period from 1952 to 1982. This was accomplished by subtracting the amount of chat that was reported on a 1982 tonnage report of 2,426,000 tons from a 1952 tonnage report of 8,000,000 tons. The difference being the estimated minimum amount of chat removed during the period . . . .

> The second step was to determine the royalty value per ton in 1982 of $0.25 and the restricted ownership percentage at 82.29%. The royalty value in 1982 was multiplied by the royalty rate in 1982 and the restricted ownership percentage to determine a 1982 dollar loss of $1,146,711. The amount of actual royalties received during the period from 1952 to 1982 was then compiled. The amount was determined to be $7,250.77. This amount primarily received in the years from 1952 to 1956, was converted to 1982 dollars utilizing the Producers Price Index. The result was an adjusted actual royalty received in the amount of $24,089.

> Next the actual royalties received in 1982 dollars of $24,089 was subtracted from the estimated 1982 royalties which should have been received of $1,146,711.

> The net result was an estimate of lost royalties from the Pioneer Chat Pile of $1,122,623. This amount was then adjusted to year 2006 dollars by utilizing the Producers Price Index. The year 2006 dollar amount was $1,848,651.40.[44]

The Quapaw Analysis team intended that this calculation of uncollected trust funds from the Pioneer chat pile should be extrapolated to determine the amount of chat income lost on the other chat piles. (This does not include investment earnings.)

### 4.     Fact:  the Government failed to collect $8,654,370.79 in payment for chat taken from the Sooner, Ottawa, Blue Goose, and Pioneer chat piles

Willis "J.R." Mathews, Thomas Crawfish Mathews, Florence Whitecrow

---

[44] Expert Rep. of Stephen Jay at 11–12 (Apr. 13, 2016) (*Quapaw Tribe* Doc. 145-10).

Mathews,[45] and Joanna Stand,[46] who own restricted interests in the Sooner Chat Pile, will testify that BIA has allowed Bingham Sand and Gravel Company to take restricted Quapaw chat worth $7,474,865.72, as calculated by Dr. Todd Lynn, since 2005. The BIA was aware of this situation from the beginning and recognized in various correspondences that Bingham's activities were unauthorized yet did nothing to remedy the situation.

Jean Ann Lambert and TC Bear, who own part of the Blue Goose chat pile, Ardina Moore and Jean Ann Lambert, who own interests in the St. Joe chat pile, and Florence Mathews, Grace Goodeagle, and Edwina Busby, who own interests in the Pioneer chat pile, will testify that, as BIA determined in a 1997 audit BIA allowed companies to continue taking chat from those three piles even after their leases had expired, without any compensation. The Quapaw Analysis identified the documents supporting this claim.[47] Dr. Lynn will testify that the Quapaw Analysis determined the value of the chat taken is $1,179,505.07 (without investment earnings).[48]

> ### 5.    Fact: the Government improperly allowed conveyances of interests in the Sooner Chat Pile out of restricted status depriving certain tribal members of ownership interests in the Sooner chat pile worth $1,738,702.93

Phyllis Romick Kerrick and Tamara Ann Romick Parker are the heirs of Quapaw tribal members and they will testify that Phillip Romick and George Romick sold their interest in restricted lands in the late 1960s and 1970s. The conveyances did not include

---

[45] QNF000004.

[46] QNF000004; QT-004402 (Order Determining Heirs of John Lee Stand).

[47] Quapaw Analysis at 100.

[48] Expert Rep. of Todd Lynn at 33 (Apr. 13, 2016) (*Quapaw Tribe* Doc. 142-11).

chat interests in the Sooner chat pile, which do not run with the land, but the BIA

processed these sales as including chat but did not require the buyers to pay for the

chat.[49] But for these breaches by the BIA in their management of conveyances of

restricted property, Phyllis Romick and Tamara Romick would own interests in the

Sooner chat pile. The same breach occurred for other chat owners during this time period

as Trenton Stand will testify. Dr. Lynn will testify as explained in his report that the value

of this claim as $1,738,702.93.

### 6.      Fact: the Government failed to collect $3,479,622 in mining royalties

In addition to their Congressional Reference claims (discussed later), the Quapaw

will present expert testimony that the Government failed to collect royalties due on lead

and zinc that was mined under BIA leases but never paid for Tucker Act claims for which

the Court may enter judgment in the *Goodeagle* case.

Because the Government failed to produce the necessary records of mining royalty

collections, the Quapaw Analysis team could not reach a conclusion regarding the

amounts owed to the Quapaw for undercollection of mining royalties. But Wayne E.

Keheley, who has spent most of his life studying the mining history of the Quapaw

reservation, will testify that he reconstructed this record by comparing government

reports of ores mined with government reports of royalties collected. Based on his

painstaking reconstruction of the record, Keheley calculated that the Quapaw allottees

should have received an additional $2,316,860 in royalty payments for ore produced but

---

[49] Expert Report of Dr. Todd Lynn at 22–24 (Apr. 13, 2016) (*Quapaw Tribe* Doc. 142-11); QG04G040152679; QG04G040197111; QEXP-016449; QEXP-016453.

not paid for between 1904 and 1929.

In addition, Keheley also calculated that there were millions of tons of chat (partially processed ore) that the U.S. Department of the Interior allowed to be used for domestic and industrial purposes between 1904 and 1925 denying the restricted Quapaw allottees royalties from extracting the remaining lead and zinc ore and also denied them payment for the sale of that re-processed chat, royalties totaling $1,162,762. The Government allowed the mining companies and railroads to take, without charge, huge quantities of chat containing unrefined lead and zinc. By allowing this valuable commodity to be taken offsite—in violation of existing leases—and used to construct roads and railroad beds without payment of any royalty, the Government failed to collect trust funds due the chat owners,

The claims for uncollected royalties for lead and zinc, including amounts contained in chat that was removed without payment, are trust fund claims that are not time-barred and therefore are properly brought in the *Goodeagle* case. For this Government failure to collect from the mining companies royalties due under the terms of their leases, the Quapaw are entitled to judgment, under the Tucker Act, of $3,479,622.

**7.    Fact: the Government failed to collect $353,365.44 for rights-of-way across individual allotments**

Trenton Stand, the Director of Realty/Trust Services for the Quapaw Tribe, will testify that the Government allowed rights-of-way to be taken over allottees' land for railroads, roads, utilities and the like, for minimal or no compensation. In total, approximately 22.0 acres for electric lines, 27.6 acres for gas pipelines, 218.7 acres for

highway and roads, and 6.2 acres for water lines rights-of-way were taken.[50]

William Harvey, a certified real estate appraisal, will testify that the electric, gas, road, and water rights-of-way are valued at $404,000 total.[51]

The Government only collected $50,634.56 compensation for these rights-of-way.[52] For many rights-of-way, no compensation at all was collected.[53] The Quapaw therefore ask the Court to hold the Government liable for $353,365.44 (without investment earnings) in uncollected rights-of-way, reflecting the difference between amounts collected and the value of the rights-of-way.

### B.      Facts concerning the Quapaw Tribe's claims

The Quapaw Analysis determined that the Government failed to collect at least $15,878.28 for agricultural leases on the Tribe's Industrial Park property,[54] $1,720 for a 30-year right-of-way across the Industrial Park Property,[55] and at least 25% of the Indian Claims Commission judgment funds–$257,399.97–went unclaimed but was not returned to the Tribe by the Government.[56]

The Government also has blocked the Tribe from receiving $2.6 million under the Land Buy-Back program—a program essential to enable the Tribe to exercise

---

[50] Expert Rep. of William Harvey at Ex. 3 (Apr. 13, 2016) (*Quapaw Tribe* Doc. 142-9; 142-10).
[51] Harvey Rep. at 33.
[52] Harvey Rep. at Ex. 3.
[53] Harvey Rep. at Ex. 3.
[54] Quapaw Analysis at 47.
[55] Jay Rep. at 13.
[56] Quapaw Analysis at 103.

sovereignty over these now-fractionated land interests.[57]

### 1. Fact: the Government failed to collect $15,878.28 for agricultural leases on the Tribe's Industrial Park property

The Quapaw Tribe owns approximately 568.02 acres of land, called the Industrial Park, which the United States holds in trust for the Tribe. The Quapaw Analysis team, after extensively reviewing the rent collection record for the agricultural leases the Government has issued on the Industrial Park property, concluded that the Government had failed to collect at least $15,878.28 in rents and other amounts due (without investment earnings).

The Quapaw Analysis team inspected two agricultural lease life-cycles, and identified numerous Government failures-to-collect under these leases, including: there being no documents related to the fair annual rental valuations, non-compliance with the lease not being enforced, failure to require bonds, failure to collect rents due, and failure to charge interest on delinquent rents.[58] The Quapaw Analysis estimated specific damages for two non-collections:

- The file does not show that the 1966 rental payment, in the amount of $2,646.38, was made.

- Tribal (7480) Statement of Account reports are missing from the file, thus the Tribe has no record of having received rent totaling $13,231.90 on this lease (not counting late fees).[59]

And in a link identified in the Quapaw Analysis as "Folder of Spreadsheet Data by Allotment," the Quapaw Analysis analyzes damages not just based on two selected lease

---

[57] Decl. of Trenton Stand, Ex. A (Aug. 15, 2016) (*Quapaw Tribe* Doc. 167-1).
[58] Quapaw Analysis at 46.
[59] Quapaw Analysis at 47.

life-cycles, but on all lease life-cycles.[60] Of the total damages figure reported by the

Quapaw Analysis for agricultural leases, a portion is comprised of undercollection of

leases.[61] These are trust fund claims with delayed accrual under the Appropriations Act.[62]

**2.     Fact: the Government failed to collect $1,720 (without investment earnings) for a 30-year right-of-way across the Industrial Park**

The Quapaw Analysis concludes that the Government granted an uncompensated

30-year right-of way across the Industrial Park property from November 1963 to

November 1993, with a principal value of $1,720.[63] The Quapaw Analysis calculated the

rights-of-way losses by first identifying a 20-year instance of trespass where the Tribe

received no compensation for the pipeline running across its land for 86 rods. The

Quapaw Analysis calculated annual damages beginning in 1964 and running through

1983 using both the $1 annual fee per rod and the $5 annual fee per rod assumptions.[64]

This principal uncollected amount of $1,720 (without investment earnings) is a trust fund

claim recoverable under the Tucker Act.

**3.     Fact: the Government prevented the Tribe from receiving $2.6 million under the Land Buy-Back program, within the six-year statute of limitations**

Under the Land Buy-Back Program Congress created in the Indian Land

---

[60] *See* Quapaw Analysis at 104.
[61] *See, e.g.*, Quapaw Analysis at 53, 55, 57.
[62] *The Shoshone Indian Tribe of Wind River Reservation v. United States*, 364 F.3d 1339, 1350–51 (Fed. Cir. 2004).
[63] Jay Rep. at 13.
[64] Quapaw Analysis at 106 (*Quapaw Tribe* Doc. 14).

Consolidation Act,[65] Interior set aside $2.6 million to purchase and to take into trust for the Quapaw Tribe fractionated interests on the Quapaw reservation.[66] This program, which would allow the Tribe to consolidate these land interests in trust for the benefit of the Quapaw Tribe, allows the Tribe to exercise sovereignty over these now-fractionated and unregulable land interests. Trenton Stand, the Tribe's Director of Real Estate, will testify that the Government in 2014 declared that it would not accept these lands in trust because they are contaminated with mining waste.[67] Since the contamination of these trust lands resulted directly from the Government's own mismanagement of the mining leases it issued, the Government is the direct cause of the Tribe's inability to obtain the $2.6 million set aside for it—and the consequent impairment of the Tribe's sovereignty.

Since the Government's refusal to release these funds occurred well within the six-year statute of limitations, the Court should enter judgment for the Tribe under the Tucker Act for the $2.6 million the Tribe has lost, plus investment earnings.

> **4.** **Fact: the Government took for itself, and failed to pay to the Tribe $257,399.97 left over from the Indian Claims Commission judgment**

In 1954 Congress appropriated funds to pay the judgment the Quapaw Tribe had obtained against the United States for inadequate compensation for its aboriginal lands in

---

[65] Indian Land Consolidation Act, 25 U.S.C. §§ 2201–2221 (amended 1991, 2000, 2004, and 2008).

[66] Decl. of Trenton Stand, Ex. A (Aug. 15, 2016) (*Quapaw Tribe* Doc. 167-1).

[67] Stand Decl. ¶¶ 6–7; *id.*, Ex. E.

19

Arkansas.[68] The Quapaw Analysis reported that at least 25% of the ICC judgment funds went unclaimed but were not returned to the Tribe by the Government:

> As of July 16, 1962, the total balance of funds to be distributed was $1,029,599.88 (Page 1). Eleven hundred and forty-four members of record were identified as eligible to receive a per capita distribution of $900. The Project Team has found no documentation that all of these funds were distributed and estimates that 25% of the funds were never distributed. Funds not distributed to individual tribal members were to be transferred directly to the Tribe, and there is no record that this happened.[69]

The Quapaw Information Systems, Inc. (QIS) team conducted years of extensive document collection and analysis, after which it concluded that approximately 25% of the ICC judgment fund was not distributed.[70] The Government offered no objection to any of the conclusions reached by the QIS team throughout the multi-year process of developing the Quapaw Analysis and it today has no explanation for what happened to the funds.

The Government's designated spokesman under Rule 30(b)(6), Michael Estes, a Program Analyst for the U.S. Office of Historical Trust Accounting, testified at his deposition that the Government had no record of where those funds had gone:

> Q. So what kind of records does the government have of where these two sums, something in excess of a million dollars, went?
> A. I haven't collected or been provided those types of documents.[71]

Earlier in this case the Government brought a motion for partial summary

---

[68] Pub. L. No. 83-663, 68 Stat. 800, 827–28 (1954); *see also* 25 U.S.C. § 912 (identifying 68 Stat. 801 as the Act appropriating funds to the Quapaw Indians for the 1954 Indian Claims Commission judgment).

[69] Quapaw Analysis at 103.

[70] Quapaw Analysis at 103.

[71] Estes Dep. Tr. 145:15–19 (*Quapaw Tribe* Doc. 153-2).

judgment that it was entitled to keep any undistributed funds,[72] and the Tribe cross-moved for summary judgment based on the Quapaw Analysis's estimate that 25% of the fund, or $257,399.97, had not been paid out to the Quapaw.[73] The Court denied the Government's motion, stating "any unclaimed judgment funds are properly credited to the Quapaw Tribe under the plain language of 25 U.S.C. § 164," but denied summary judgment on the issue of whether all of the funds had been paid out to the Quapaw because conflicting evidence created a triable issue of fact, and discovery was ongoing.[74]

The Court also found that while the Government's evidence proves that the entire balance of the two Quapaw tribal trust accounts was withdrawn between July 1, 1960 and June 30, 1963,[75] and that $77,200 of that sum went into individual Indian money accounts for minors, that evidence is not sufficient to support a finding that the entire balance of the two accounts was distributed to Quapaw distributees at $900 each—as the Government argues.[76]

But since that ruling the Government has produced no records supporting its claim that all of the Quapaw Tribe's judgment funds were distributed to the Quapaw. The record remains where it was before, with the Government unable to show where those funds went (except for about $77,000 deposited in accounts for minors). On this record,

---

[72] Def.'s Mot. for Partial Summ. J. (Allegedly Unclaimed Per Capita Payments) (Dec. 8, 2014) (*Quapaw Tribe* Doc. 59).

[73] Pl.'s Opp. To Gov'ts' Mot. for Partial Summ. J. and Pl.'s Cross-Mot. (Jan. 22, 2015) (*Quapaw Tribe* Doc. 66).

[74] *Quapaw Tribe of Okla. v. United States*, 120 Fed. Cl. 612, 617 (2015) (*Quapaw Tribe* Doc. 87).

[75] U.S. Treasury Combined Statements Fiscal Years 1960–63 (*Quapaw Tribe* Doc. 66-9).

[76] *Quapaw Tribe of Okla.*, 120 Fed. Cl. at 618 (*Quapaw Tribe* Doc. 87).

where the trustee cannot show how it disposed of trust funds, the Court may reasonably find that the trustee did not give those funds to the beneficiary (as the Government claims here). For when a party has relevant evidence within its power to produce but fails to do so, the Court may infer that evidence is adverse to the party: "[I]f a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable."[77]

The Court should rely on the Quapaw Analysis's conclusion, which was based on this same absence of trust records, that a portion of the funds—$257,399.97 (estimated at 25%, without investment earnings)—was not distributed to the Quapaw.[78] This is a trust fund claim under the Tucker Act.

## III.   Facts the Quapaw will prove in support of their Congressional Reference equitable claims

The Quapaw will prove that the Government's wrongful or negligent acts caused significant losses to the Tribe and also to its members. To the extent those losses occurred outside the Tucker Act's six-year statute of limitations, the Court should report them back to the House of Representatives as legitimate, proven equitable claims.

---

[77] *Caroline Hunt Trust Estate v. United States*, 65 Fed. Cl. 271, 291 (2005), *aff'd & rev'd in part*, 470 F.3d 1044 (Fed. Cir. 2006); *see also Day & Zimmermann Servs. v. United States*, 38 Fed. Cl. 591, 602 n.13 (2006) ("[T]he adverse inference rule, more a 'product of common sense than of the common law,' *Int'l Union (UAW) v. NLRB*, 459 F.2d 1329, 1335 (D.C. Cir. 1972), provides that when a party has relevant evidence within its control and fails to produce such, that failure raises the presumption that if in fact produced, it would be unfavorable to its cause.").

[78] *Quapaw Tribe of Okla.*, 120 Fed. Cl. 612, 617 (2015) (*Quapaw Tribe* Doc. 87).

### A.      Facts concerning the Tribe's equitable claims

The Tribe's claims for losses due to the government's conveyance of the Catholic

Forty property without compensation in 1908, and the Government's failure to charge

fair market value for agricultural leases it issued on the Tribe's Industrial Park property

are valid legal claims that fall outside the six-year statute of limitations—and thus should

be reported back to Congress as valid equitable claims owing to the Tribe.

### 1.      Fact: the Government's uncompensated conveyance of the Catholic Forty caused the Tribe a loss of $110,535.22

The Quapaw Analysis reports that in 1908 without the Quapaw's knowledge the

Government deeded forty acres of the Tribe's trust land (the Catholic Forty) to the

Catholic Church, which in 1927 closed the Indian school it had been operating and

instead commenced mining operations on the land:

> The Quapaw Tribe was unaware that a fee patent was issued in 1908 on the SW NE Sec.6-T28N-R24E, which extinguished the trust title and the reversionary clause, as prescribed by the original indenture given by the Quapaw Council to the Bureau of Catholic Indian Missions. The Secretary of the Interior thus appears to have disregarded his duty to restore title of the Catholic Mission Land to the Tribe after the school and church no longer existed. The Tribe repeatedly contacted Catholic Church officials for return of ownership of their land. The Project Team could find no efforts or support offered by the DOI. While it held the property, the church removed lead and zinc ore from the premises, sold chat, and left a huge pile of chat on the property. The BIA made a chat lease in 1977 on these 40 acres. The agreement was never carried out, and there has not been any government supervised activity on this property since then. Eventually, the Tribe was able to have the tract (excepting the cemetery) returned to trust status. Today, however, due to the Church's 68-year span of ownership, the tract is an unusable wasteland.[79]

The only possible legitimate claim the Catholic Church had to the land was to use

---

[79] Quapaw Analysis at 37.

the land for educational purposes. For many years Quapaw children were schooled on the reservation by Roman Catholic priests and nuns. The Quapaw Analysis states that "[i]n 1893, the National Council of the Quapaw Tribe made an indenture to the Catholic Church under which forty (40) acres of Tribal land was set aside for the benefit of the Quapaw People, as long as the land was used for school purposes."[80] But the Catholic Church abandoned use of the land for that purpose in 1927. It was then that the land should have reverted back to the Tribe.

The evidence shows that all of the royalties from the mining and chat sales on the Catholic Forty went to the Church, and not the Tribe. Accordingly, the Quapaw Analysis concluded:

> [T]he royalty realized by the Catholic Church from removal of lead, zinc and chat from 1937 to 1975 is a valid damage due and owing to the Tribe. The Project Team has thus calculated the amount of lead and zinc that was known to be removed from the premises of this 40-acre tract, as well as the amount of chat sold.[81]

In all, the Quapaw Analysis determined, and Jay will testify, that the Tribe suffered four types of losses from the Government's uncompensated conveyance of the Catholic Forty property:

- The Catholic Church was paid a base Royalty for a mining lease applicable to the Catholic Mission Land in the amount of $4,524.32 in 1937.

- Chat sales applicable to the Catholic Mission Land were determined to be $7,336.27 prior to 1969, and additional chat sales were determined to be $2,824.63 for the year 1969.

---

[80] Quapaw Analysis at 37.
[81] Quapaw Analysis at 37.

- Loss Due to Additional Costs Anticipated to Return the Catholic Mission Land Cemetery to Trust Status $57,500.

- Agricultural leasing losses of $38,350.[82]

Total:  $110,535.22 (without investment earnings).

The Government's uncompensated conveyance of the Catholic Forty was a wrongful act causing damage to the Tribe—an equitable claim within the terms of the Congressional Reference. The Catholic Church itself in 1975 acknowledged that the 1908 conveyance by the Government was wrongful and contrary to the intent of the Quapaw at that time, and agreed to returned the land to the Quapaw trust:

> Eighty years have elapsed since the tribal land in question was "set apart" by the Quapaw Tribe for a specific use by the Church. . . .

> [T]he basic question . . . is: SHALL WE RETURN THE LAND TO THE QUAPAW TRIBE? It seems to me only one answer is possible in all justice and charity. In my opinion, it was not the intent of the Quapaw Tribe to transfer the land permanently. Land, to the Indian, is "sacred" and not to be sold, bartered or traded. It is held in trust for God.

> I therefore, recommend that the land be returned to the Quapaw Tribe without cost at the soonest possible date.[83]

### 2. Fact: the Government charged less than fair market value for agricultural leases on the Tribe's Industrial Park land, resulting in losses of $503,191

The Quapaw Analysis shows that the Government failed to charge market rents for agricultural leases it issued on the Tribe's Industrial Park property, a wrongful or

---

[82] Jay Rep. at 13. Jay's expert report identifies agricultural land losses as $541,541, which is comprised of $38,350 in losses for Catholic Forty and $503,191 in losses for Industrial Park (without investment earnings).

[83] Letter from Charles J. Harrington, Diocese of Tulsa, to Bishop Bernard J. Canter at 3 (Apr. 23, 1974) (Quapaw Analysis, Catholic Mission Minerals Land Management Chat Piles Folder, Picture 095).

negligent act constituting an equitable claim for losses that this Court should report back to Congress. The Quapaw Analysis found that the rents BIA obtained for the Industrial Park property fell far behind inflation and economic development:

> The unique fact about this allotment is that for some 43 years, from 1956 to 1998, the Industrial Park rental ranged from $0.59 per acre on Lease #1062 (Pictures 01-05) to $16.53 per acre on Lease #1955 (Pictures 06-10). These rentals were below average, and below market value, and they increased by only 3.57% over a 43-year period.[84]

The Quapaw Analysis reports, and Jay will explain, that the QIS team determined the amount of these agricultural losses by applying a sophisticated agricultural production model to usable agricultural land, as determined from aerial photographs. Basic agriculture acreage on the Industrial Park lands was estimated as 434.1 acres, and the loss from 1937 to 2006 was computed by multiplying the basic agriculture rental rate in 2006 of $35, adjusted by the Producer's Price Index (PPI) to the acreage amount.[85] In addition, the number of acres in the Tribal Industrial Park for recreational use was estimated to be 115 acres at a rental rate of $7.73, with adjustment for the appropriate price index from 1937 through 2006.[86] Jay will testify that the $541,541 total for agricultural land losses on tribal trust lands includes $503,191 for Industrial Park losses (without investment earnings).[87]

---

[84] Quapaw Analysis at 46.
[85] Jay Rep. at 7–8.
[86] Jay Rep. at 8.
[87] Jay Rep. at 13.

**3.   Fact: the contamination and subsidence from the Government-authorized mining program destroyed the natural resources on 40 square miles of the Quapaw's reservation, a loss of $740,929,000.**

The evidence will show that the Government's mismanagement of lead and zinc mining on Quapaw lands has destroyed their economic (as well as cultural) value to the Quapaw. Former Oklahoma Governor Keating will testify that, as his Tar Creek Task Force final report states: "There are an estimated 1,320 mine shafts in the Tar Creek Superfund area, plus thousands more drill holes and other openings" with "[p]ossibly more than 300 shafts [] in the Picher/Cardin area alone and over 2,600 shafts in the entire Tri-State Mining District."[88] Additionally, "[a]s of 1986, 59 "major" collapses were identified that disturbed approximately 47 surface acres" and "[a]t least eight more collapses have occurred since 1986 (including State Line Road)."[89]

Tim Kent, Director of the Tribe's Environmental Department, will testify that EPA designated 40 square miles of the Quapaw's 92-square-mile reservation as the Tar Creek Superfund site in 1983, and EPA began work on the site in 1984. And that, as the Government's Rule 30(b)(6) spokesman, EPA Branch Chief of the Remedial Branch of the Superfund Division John Meyer is expected to testify, as he did at deposition, that EPA projects that its cleanup work on Operable Unit 4 (mining waste cleanup) will not

---

[88] Governor Frank Keating's Tar Creek Superfund Task Force Final Report ("Tar Creek Final Report") at 9–10 (Oct. 1, 2000).
[89] Tar Creek Final Report at 8.

be completed for another 30 years[90] and EPA has no firm estimate of when it will even start work on Operable Unit 5.[91] Kent will also testify that, even when this cleanup is completed, most of the land and water will remain contaminated and unusable—just less dangerous than it now is.

Recognizing the BIA's culpability in polluting the Quapaw's reservation, EPA has administratively identified the Department of Interior as a responsible party at the Tar Creek Superfund site[92] and required Interior to reimburse a portion of the cleanup costs.[93]

The Quapaw's appraisal expert witness, Bill Harvey, will testify that this environmental contamination of the Quapaw's land has a substantial negative impact on the fair market value of the land, decreasing it by $243,329,000.

> In its current condition, the subject property is significantly impaired by the existing Class IV (legal), Class VII (site and infrastructure) and Class VIII (environmental) detrimental conditions and the property is generally not productive for its beneficiaries. In my opinion, the property will remain unproductive until such time as the hazardous waste and subsidence problems are remediated.[94]

And Dr. John Duffield, an economist specializing in natural resource valuation, will

---

[90] Meyer Dep. 20:14–17 (Feb. 17, 2016) ("Q. Okay. So we would expect— so the plan was that the remedy for Operable Unit 4 would be completed about 30 years after 2010? A. That was the projected time frame.).

[91] Meyer Dep. 45:9–11, 14, 16–18 (Feb. 17, 2016) ("Q. When will EPA be at a point that it can enter a Record of Decision or a Decision of Record, I suppose, for Operable Unit 5? . . . A. I don't know. . . . Q. You don't know. Do you have any estimate? A year, ten years, somewhere between? A. I would say it is somewhere between.").

[92] Administrative Order on Consent for RI/FS for ROU4, *In the Matter of Tar Creek Superfund Site*, CERCLA Docket No. 6-03-01 (December 9, 2003).

[93] Notice of Lodging of Proposed Consent Decree Under CERCLA, 80 Fed. Reg. 76,312–13 (Dec. 8, 2015) ("[T]he Settling Federal Agency (the Department of the Interior) is resolving its CERCLA liability at the Site by paying $5.0 million.").

[94] Harvey Rep. at 2.

testify that the economic value of the lost natural resources, including aquatic, terrestrial, and groundwater services, totals $497,600,000.[95]

The loss in land value and the loss in natural resource value, which together total $740,929,000, result directly from the Government's wrongful or negligent management of mine leases it granted on Quapaw lands—an equitable claim that the Court should report back to Congress.

### B.     Facts concerning Quapaw Individual claims under the Congressional Reference

The owners of restricted allotted lands on the Quapaw reservation expect to prove five separate equitable claims—which are legal claims outside the Tucker Act's six-year statute of limitations.

#### 1.     Fact: the Government's mismanagement of mining wastes deposited on, and failure to charge fair market value for, town lots resulted in losses of $18,219,942.61

The Quapaw Analysis reports that mining operations under Government-granted leases had rendered half of the Quapaw's 14,500 town lots unusable by 1926 due to chat pilings on the town lots.[96] The number of leasable lots decreased over time as the BIA allowed more chat to be piled up on the lots. A 1933 letter estimates that only 6,000 town lots "in the mining district" could be rented due to chat piling.[97]  Both a 1943 letter[98] and a 1954 government report of a complete survey indicated that "one-half [4,046] of the

---

[95] Expert Rep. of John Duffield at 4 (Apr. 13, 2016) (*Quapaw Tribe* Doc. 142-4).
[96] Quapaw Analysis, Town_Lot_ReferenceDocs, at Pic. 7.
[97] Quapaw Analysis, Town_Lot_ReferenceDocs, at Pic. 16.
[98] Quapaw Analysis, Town_Lot_ReferenceDocs, at Pic. 13.

8,092 [original] lots" were covered with chat in those years.[99]  This report estimated that only 4,000 lots were leasable in 1954.[100]

The Quapaw Analysis reports that these losses resulted from the Government's failure to hold the lessees responsible for their disposal of mining waste on these town lots:

> Another issue concerning the town lots is the chat piles that were dumped on these trust allotments. The lots in these additions to the town of Picher have been unleaseable since the early 1900's. Therefore, no revenue has been received for over 80 years. (The lessees that had mining leases were not held responsible by DOI for reclamation of the surface land nor were their bonds forfeited for any cleanup effort.)[101]

The Quapaw Analysis further found:

> The property known as Picher remained a mining camp. The BIA did not sell the surface under the tents, cabins and houses located on the lots. The town was sub-divided into several additions. The majority of them were on trust allotments. The BIA issued permits and collected trespass for the use of the surface only. There were as many as 14,500 town lots in and around the mining district. By 1925, the chat was piling upon the surface of these allotments. Hundreds of lots became the surface beneath the chat piles and the BIA ceased collecting rental or trespass on these lots. This trespass has continued for 80 years and still exists today.[102]

The Quapaw Analysis also found that "the records—or lack thereof—reveal a pattern of neglect in the management of this trust property for the benefit of its Indian owners that has been allowed to continue since 1918":

> Adequate and accurate records were never maintained on these lots. The community that came to be known as the City of Picher, Oklahoma, was the heart of the "mining district." When lead and zinc were discovered in

---

[99] Quapaw Analysis, TribalTrustAccount_ReferenceDocs, at Pic. 55.
[100] Quapaw Analysis, TribalTrustAccount_ReferenceDocs, at Pic. 56.
[101] Quapaw Analysis at 94.
[102] Quapaw Analysis at 95.

1902, miners began squatting in tents, cabins and houses in and around this area. No rental was collected for the trust owners prior to 1918.[103]

The Quapaw will also present the testimony of former BIA officials Overberg,

Dalgarn, and Elsberry, who will testify in addition that, as the Quapaw Analysis found,

the Government failed to charge adequate rents for these town lots, and "actually reduced

rental values by half in 1931 and 1932."[104] For example, Dalgarn states:

> When I arrived at the Miami Agency in 1981, town lots were valued at $1.00 per front foot. There had been and appraisal done in 1978 valuing the lots at $3.00 a front foot. In 1979 a re-evaluation had been done reflecting the rental rate at $1.00 a front foot. Between 1978 and 1979, several meetings were held concerning the rental rate increase proposed by the Agency with local residents, town officials, and politicians, including a U.S. Congressman, who supported rates lower than the 1978 appraisal. The Area Office eventually agreed to charge only $1.00 a front foot despite the earlier appraisal of $3.00. In my opinion, $3.00 was a more reasonable fair market rate and the second appraisal was based on political pressure, not because they were actually worth less.[105]

The Quapaw Analysis team determined, as Jay will explain, that the total losses

resulting from the combined effects of mining waste disposal on town lots and the

Government's failure to charge market value rents was $18,219,942.61 (without

investment earnings)—a loss that, because it resulted from the Government's wrongful or

negligent acts, should be reported to Congress as a valid equitable claim.

### 2. Fact: the Government's mismanagement of mining waste and failure to charge fair market rents resulted in a loss of $29,670,922 from the Quapaw's agricultural lands

The Quapaw Analysis also found that large segments of the Quapaw's agricultural

lands had been made unusable by discharge of mining waste on them. And for the land

---

[103] Quapaw Analysis at 94.
[104] Quapaw Analysis at 96.
[105] Expert Rep. of John Dalgarn at 7 (Apr. 13, 2016) (*Quapaw Tribe* Doc. 145-7).

that was leased, the Government failed to charge fair market rents—resulting in a loss of $29,670,922 (without investment earnings).

The Quapaw Analysis reports that much of the Quapaw's valuable agricultural land is now covered by chat:

> The Quapaw trust and restricted Indian lands contained in the individual and Tribal allotments studied in this Project have been damaged and depleted by mining policies and practices. As a result, much of the land is now covered in toxic chat. In addition to the negative impacts of mining, these lands have also been poorly managed, and underutilized as productive agricultural assets. With proper management these lands could have been much more financially beneficial to their Indian owners, the same Indian owners whom the DOI and BIA are entrusted with serving. Historical research demonstrates the Quapaw Tribe's ability to operate farms and establishes that prior to mining this land was considered prime farm land with high crop potential.[106]

The Quapaw Analysis team carefully identified the agricultural lands that, because they were covered with mining waste, would not grow crops, and created an economic model to measure the lost income:

> The first step in this process was locating and determining the amount of agricultural land contained in each allottee's parcels. We used high resolution aerial images and Arcview Software to carry out our digital ortho-quarterquad analysis of each allotment. We deducted acreage related to roads, railroads, buildings, lakes and streams from the potential agricultural acres for each parcel. We determined any acreage in a riparian area as an input into the Pecan Enterprise option. Any acres included for Pecan Enterprise were deducted from the total acres available for any of the other Ag uses. Review of historical documents demonstrated that prior to and absent from mining impact, the Quapaw Tribal land supported the growing of wheat, corn, soybean, hay and other crops. The first model considered only a hay enterprise. The second model we looked at was a wheat, corn, soybean, and fallow rotation enterprise. Finally, we calculated

---

[106] Quapaw Analysis at 108.

a model based only on land rental rates.[107]

Because these losses resulted from the Government's mismanagement of these trust assets—its wrongful or negligent acts—and the Tucker Act claim is barred by the six-year statute of limitations, the Court should report this claim back to Congress as a valid equitable claim.

Although the allotments owned by individual members of the Quapaw Tribe were (and some still are) highly productive agricultural lands, the Quapaw Analysis determined:

> The farming and grazing leases were made for Quapaw lands for $1 per acre in 1895 and were advertised in 1933 by the agency for that same amount. By 1945 the surface leases were still at that price. Lease files from 1946 to 1958 on a majority of the allotments were never provided to the Project Team. There were years characterized in many instances by the lack of any compliance with federal trust standards, or by the construction of improvements on the Indian leaseholds without proper authorization or documentation. The surface acres under lease dwindled rapidly as chat was piled on the hay meadows and cropland.[108]

Although BIA "Archival and Agency records allowed the Project Team to reconstruct 165 leases and three revocable permits," this was not easy:

> The Project Team finds it necessary to comment on the management of the records at the Miami Agency. The lease files and the Allotment files furnished to the Project Team (MIA and MIM Collections) at the Agency, were in general disarray. There was no continuity as to the order of the actions that took place, portions of the general provisions are missing and misfiled in other file folders, and correspondence between the Agency, the lessees and the lessors is predominately absent. Evidence of payment history was not consistently kept in the files. The Project Team was compelled to search collections from other repositories when reconstructing

---

[107] Quapaw Analysis at 115.
[108] Quapaw Analysis at 7.

a lease file pursuant to 25 C.F.R. Part 162.[109]

Using the available documents, the Quapaw Analysis investigated and made individualized findings as to each of the 13 allotments, linking electronically to the documents relating to each allotment.[110] Those findings demonstrated that BIA had failed in its trust obligations by covering portions of the agricultural land with chat and mining waste,[111] entering into sub-market leases,[112] failing to collect rent when due,[113] and failing to attempt to lease or make productive use of the land,[114] resulting in significant losses to the Quapaw owners.[115]

To determine the revenue losses suffered by the allotment owners, Jay will explain that the Quapaw Analysis used models to develop reasonable rental rates for three types of common agricultural uses on Quapaw lands: basic agriculture (hay, row crops), recreation (hunting and fishing licenses), and pecan orchards:

> Agricultural Losses for Basic Agriculture, Recreational Lands and Pecan Enterprise in the Quapaw Analysis was determined using various models to estimate either rental rates or net income per acre for the various types of acreage. A rental enterprise model was used for basic agriculture, a recreational lease enterprise model for recreational lands, and a pecan enterprise model for pecans. The initial step in preparing each model was to estimate the amount of acreage for each type of crop or revenue source. This was accomplished by analyzing aerial photographs of the subject property. The second step was to determine a representative rental rate or net income rate for each acreage type. Estimation of rental rates for basic agriculture was accomplished from information from the Ottawa and

---

[109] Quapaw Analysis at 50.
[110] Quapaw Analysis at 52–93.
[111] *E.g.*, Quapaw Analysis at 52, 56, 63–64, 66.
[112] *E.g.*, Quapaw Analysis at 53, 57–58, 59–62, 67–69.
[113] *E.g.*, Quapaw Analysis at 53, 57–58, 59–62, 67–69.
[114] *E.g.*, Quapaw Analysis at 53, 57–58, 59–62, 67–69.
[115] *E.g.*, Quapaw Analysis at 53, 57–58, 59–62, 67–69.

Cherokee Extensions, real estate agents and Oklahoma State University. Rates used represented the average rate from the various research sources for the year 2006. A rental rate of $35 was established for basic agriculture products. Rental rates for recreational use were based on a study of recreational lease rates from the Nobel Foundation. A rental rate of $7.73 was used for recreational acreage. The pecan enterprise model, used for pecan losses, was sourced from studies conducted by the Sustainable Agriculture Research Education Program. Such studies indicated a net income yield of approximately $100 per acre for native pecan acreage. A net income rate of $100 per acre was utilized for the pecan enterprise model.[116]

To determine the amounts that should have been earned on the agricultural lands

on each of the 13 allotments, the Quapaw Analysis categorized the acreage on each

according to its usability for basic agriculture, recreation or pecan trees:

And applied the rental rates in 2006 of $35 for basic agriculture acreage or $7.73 for recreational acreage, or the pecan net income rates of $100 per acre to estimate each loss claim. The rates had been established at a 2006 price and therefore were adjusted by either the Consumer Price Index (CPI) for the years 1895 to 1912 or the Producer's Price Index (PPI) for the years 1913 to 2005, to convert 2006 dollar values to the amount for the appropriate year.[117]

After deducting the amounts actually collected in agricultural rent according to

BIA records, the Quapaw Analysis determined that the principal agricultural losses for

these 13 allotments, without interest or investment income, was $3,185,277.[118] This is an

equitable claim that should be reported back to Congress as valid.

3.     **Fact: the Government issued mining leases on Quapaw lands for below-market royalties, and failed to obtain any royalties for germanium and sulfuric acid, resulting in losses of $37,061,875 to the Quapaw**

Dr. Douglas Littlefield, a historian who has spent years researching the mining

---

[116] Jay Report at 7.
[117] Jay Report at 7–8.
[118] Jay Report at 13.

history of the Quapaw reservation, will testify that speculators obtained mining leases

from the Government at low royalty rates, then flipped those leases to other speculators

in a scheme called "pyramiding" by which mining companies eventually paid royalties of

25% or more, of which the Quapaw generally received 5–10%. The remainder went to

the speculators rather than to the Quapaw:

> Royalty pyramiding was a wide-spread leasing practice whereby the original lessees of Quapaw mining lands sublet those agreements to third parties for larger royalty percentages than paid to the original Quapaw lessors. Pyramiding frequently took place on multiple levels, which led to extremely high royalty rates for the final lessee while the original royalty rates stayed constant for the Quapaw landowner. Overlapping chronological leases and lease assignments assisted pyramiding. All of these practices extracted wealth from Quapaw mineral lands where that money often far exceeded what was paid to the Quapaws.[119]

The Quapaw will also present the testimony of two mining experts, Dr.

Christopher Breeds and Edward Keheley, both of whom will testify that the Government

mining leases provided royalty rates that were well below market and that the

Government failed to properly enforce the Quapaw mining leases in place.

Dr. Breeds will testify that the Quapaw should have received an additional

$3,798,557 in royalties had steps been taken to avoid improper royalty pyramiding.[120]

And Dr. Breeds will testify that had the Quapaw's interests been prudently managed by

the United States, for years 1907–1945, they should have received $26,850,822.[121] And

Dr. Breeds will testify that proper mining practice could have, and should have, avoided

---

[119] Littlefield Rep. at 1.

[120] Expert Rep. of Dr. Christopher Breeds at 1 (Apr. 13, 2016) (*Quapaw Tribe* Doc. 142-6).

[121] Breeds Rep. at 1.

much of the subsidence and environmental damage that has occurred to Quapaw lands.[122]

Corroborating Dr. Breed's opinion, Dr. Keheley will testify that restricted Quapaw allottees were paid insufficient royalties for the lead and zinc concentrates removed from their lands between 1904 and 1929 due to an inequitable leasing system endorsed by the U.S. Department of the Interior.[123] Dr. Keheley also concluded that the market royalty rate should have been 20%, the same rate independently determined by Dr. Breeds, Keheley corroborates Dr. Breed's calculation of lost royalties, estimating that between 1904 and 1929, the Quapaw should have received an additional $18,592,852 in royalties.

Dr. Breeds also calculated that the Quapaw should have received $3,592,396 in royalties for two other minerals, germanium and sulfur—for which the Government failed to collect any royalties at all:

> While non-restricted lessees apparently were paid for all minerals extracted from the ore, restricted Quapaws were paid only for lead and zinc and the mining companies, Eagle Picher specifically, were able to sell subsidiary minerals [germanium and sulfur] extracted from the ore while paying no royalties. This apparently was because the US Government wrote leases to protect Eagle Picher from having to pay royalties on these subsidiary mineral products. The calculations are based on royalty that should have been collected at 15%.[124]

The Interior Department was well aware of this failure, and urged the Justice Department to file suit to recover these royalties:

> [I]t is respectfully recommended that the Attorney General be requested to reconsider his decision to abandon the prosecution of any claim against the Eagle-Picher Company based upon the alleged invalidity of the commercial lease of 1912 on the Mary Whitebird allotment, or to recover from the

---

[122] Breeds Rep. at 1.
[123] Expert Rep. of Wayne E. Keheley at 1–2 (Apr. 13, 2016) (*Quapaw Tribe* Doc. 142-3).
[124] Breeds Rep. at 2.

company any part of the proceeds derived from utilization by the company of the sulphur content in the lead and zinc ores. It is further recommended that the Attorney General be urged to bring an appropriate suit for the purpose of obtaining final judicial determination of the claims of these Indians on their merits.[125]

BIA's leasing practices encouraged mining companies to mine only the most profitable ore, leaving less profitable, but valuable ore in the ground. Dr. Breeds and Dr. Keheley will testify that high-grading occurred on restricted Quapaw land, throughout the mining period, resulting in the loss of royalties associated with sterilized low grade ore.[126] Keheley calculated that the restricted Quapaw allottees lost $2,820,100 in royalties due to this high-grading practice.[127]

Because these lost royalties resulted from the Government's wrongful or negligent act—its failure to charge market royalty rates (or none at all)—that is barred by the six-year statute of limitations, the Court should report these lost mining royalties to Congress as a valid equitable claim for $37,061,875 (lost royalties for lead and zinc from 1907-1945 of $26,850,822; lost royalties from pyramiding for $3,798,557; lost royalties for germanium and sulfur of $3,592,396; lost royalties for high-grading of $2,820,100) (plus investment earnings to be proved at trial).

### 4.    Fact: the Government leased and sold chat at below-market prices, resulting in losses of $13,237,034

Similar to mining royalties, the Government failed to charge market prices for the chat it sold (sometimes by lease and sometimes by sale agreement), resulting in

---

[125] U.S. Dep't of the Interior, Quapaw—Mineral Lease, 1934 WL 61744 (Solicitor Gen. Op. Aug. 21, 1934).
[126] Breeds Rep. at 2.
[127] Keheley Rep. at 2.

substantial losses to the owners of those chat piles. The Quapaw Analysis concludes that

- A report prepared from Form No. 5425 (Annual Report of Caseload) (Pictures 274-605) found in the DOI Mining Collection shows *reported* tons of chat sold. The figures of the tons of chat *reported* as sold and the money received on the chat sold reveals gross underpayment of royalty and underreporting of tons of chat sold. This tonnage *reported* entails all chat piles. The averaged royalty amount was divided into the average tonnage amount sold which revealed the chat pile owners received an average of $0.06 per ton.[128]

- The verification of minimum royalty payments is absent from the lease files provided.[129]

- The lease management documents, or lack thereof, repeatedly form a pattern of disregard for accuracy in compensation of the trust owners in the mining district. The theft of chat was routinely ignored and little enforcement was executed. The mismanagement continues to this day (Pictures 730-795).[130]

Dr. Lynn, an engineer and co-owner of a construction materials testing and engineering firm with experience using chat, will testify that for the sales of Quapaw chat from 1924 to 1996, the federal government failed to obtain fair market value for the Quapaw allotees' chat, resulting in lost royalties of $13,237,034. Lynn explains in his report:

The Bureau of Indian Affairs used a "royalty" calculation to determine the value to the Quapaw owner. As early as 1926, the Superintendent of the Agency noted that this would result in an unfair valuation for the Quapaw owners. Despite early concerns over using this approach, the BIA started using a royalty approach that was firmly entrenched by the 1950s. A July 1940 letter illustrates that, as has been typical in the oil and gas industry, the already low royalty rate realized to the Quapaw owners, was being manipulated resulting in payments that were often undervalued.[131]

---

[128] Quapaw Analysis at 100.
[129] Quapaw Analysis at 100.
[130] Quapaw Analysis at 100–01.
[131] Expert Rep. of Todd Lynn at 7–8 (Apr. 13, 2016) (*Quapaw Tribe* Doc. 142-11).

This loss should be reported to Congress as an equitable claim for $13,237,034, plus investment earnings to be proved at trial.

### 5. Fact: BIA failed to collect $1,731,053 (without investment earnings) for chat taken from the Ottowa chat pile without compensation between 1988 and 2004

Florence Whitecrow Mathews, Ardina Revard Moore, and Jean Ann Ramsey, who own restricted interests in the Ottawa chat pile, will testify that between 1988 and 2004 BIA allowed Bingham to take 1,966,630 tons of chat without payment. Dr. Lynn will testify that, as stated in his report, that chat is worth $1,731,053.66 (without investment earnings).[132] These unauthorized removals and sales of chat without payment to the owners were contrary to the law and BIA regulations requiring that payment must be made to the restricted owners for each sale of chat.

## IV. Facts the Quapaw will prove in support of the investment earnings value of each claim

The Court has ruled that instead of interest the Quapaw are entitled to recover the investment earnings they would have received if the Government had collected the amounts owing to them and deposited those sums in their trust accounts: "[B]ecause the United States holds Plaintiffs' IIM funds in trust, there is a fiduciary duty on the part of the Government to prudently invest them in order to maximize the return."[133]

To help the Court determine the investment earnings figure due on each item of the Quapaw's damages, the Quapaw will present the testimony of the two principals of Rocky Hills Advisors, an investment firm specializing in investment of Indian tribal trust

---

[132] Expert Rep. of Lynn at 33.
[133] *Goodeagle v. United States*, 122 Fed. Cl. 292, 296 (2015).

funds. Peter Ferriero, a licensed Series 66 investment advisor and CEO of Rocky Hill

Advisors, Inc., with experience in Native American breach of trust cases, will testify how

he and Kevin Nunes "calculated what the principal amounts of [the Quapaw's] damages

would have earned had they been invested in an investment portfolio" that comports with

requirements set forth under 25 U.S.C. §§ 161, 161a, and 162a.[134]

Kevin Nunes, a licensed Series 65 investment advisor and CFO of Rocky Hill

Advisors, Inc., with experience analyzing historical Indian trust accounting data, will

testify to the actual amounts due on each item of damages using the Rocky Hills

model. For each item of damages computed by the Quapaw's experts, Nunes computed

"the amount of investment earnings that this principal sum would have accrued from the

inception point of the various principal damage calculations through the end date of

December 31, 2015."[135]

## V.      Applicable legal principles

The Government is liable in Tucker Act damages for breach-of-trust where the

Government's statutory control of Indian resources and land goes " beyond the "bare" or

minimal level," and can "fairly be interpreted as mandating compensation."[136] And, to

prove an equitable claim under a Congressional Reference, the plaintiff "must show only

two things: 'that the government committed a negligent or wrongful act' and that 'this act

---

[134] Expert Rep. of Peter Ferriero & Kevin Nunes at 3 (Apr. 13, 2016) (*Quapaw Tribe* Doc. 142-5).
[135] Ferriero & Nunes Rep. at 4.
[136] *White Mountain Apache Tribe v. United States*, 537 U.S. 465, 474 (2003).

caused damage to the claimant.'"[137]

Once the Indians have established their prima facie case by demonstrating the trustees' breach of fiduciary duty, the burden of proof on damages shifts to the Government because "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."[138]

The Quapaw rely on the following lead cases:

- *Caroline Hunt Trust Estate v. United States*, 65 Fed. Cl. 271 (2005), *aff'd & rev'd in part*, 470 F.3d 1044 (Fed. Cir. 2006)

- *Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001)

- *Confederated Tribes of Warm Springs Reservation of Or. v. United States*, 248 F.3d 1365 (Fed. Cir. 2001)

- *Fort Berthold Reservation v. United States*, 182 Ct. Cl. 543 (1968)

- *Jicarilla Apache Nation v. United States*, 100 Fed. Cl. 726 (2011)

- *Matter of Elliott*, IP OK 246 P 93 (U.S. Dept. of Interior Office of Hearings & Appeals, Jan. 30, 1995)

- *Menominee Indian Tribe of Wis. v. United States*, 39 Fed. Cl. 441, 457–58 (1997).

- *Osage Nation v. United States*, 57 Fed. Cl. 392 (2003)

- *Osage Tribe of Indians of Okla. v. United States*, 72 Fed. Cl. 629 (2006)

- *Osage Tribe of Indians of Okla. v. United States*, 93 Fed. Cl. 1 (2010)

- *Osage Tribe of Indians of Okla. v. United States*, 96 Fed. Cl. 390 (2010)

---

[137] *Bear v. United States*, 112 Fed. Cl. 480, 485 (2013) (internal quotation marks omitted) (*Bear* Doc. 16).
[138] *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946).

- *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339 (Fed. Cir. 2004)

- *United States v. Mitchell*,  463 U.S. 206 (1983)

- *United States v. Noble*, 273 U.S. 74 (1915)

- *White Mountain Apache Tribe v. United States*, 537 U.S. 465 (2003)

Attached as Exhibit 1 is a summary of the Governments' duties and obligations related to five areas: mine tailings and chat, mine leasing, town lot leasing, agricultural leasing, and rights-of-way. In accordance with the Court's November 5, 2015 pretrial order, the Quapaw have also provided the Court with an appendix containing copies of the applicable laws and regulations relevant to this case.

The Quapaw further summarize the legal principles that control this case as follows:

## A.    The Government has a fiduciary duty to properly manage the Quapaw's trust funds and trust assets

1.      "[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection."[139]

2.      The proper discharge of the Secretary of the Interior's trust responsibilities to Indian tribes includes "[a]ppropriately managing the natural resources located within

---

[139] *United States v. Mitchell*, 463 U.S. 206, 225 (1983).

the boundaries of Indian reservations and trust lands."[140]

### B.     Congress has given the Government, as trustee, comprehensive supervision and control over the Quapaw's restricted land and mineral assets

3.     A number of statutes and regulations restrict the Quapaw's right to alienate their allotted lands. On March 2, 1895, Congress ratified the Quapaw Allotment Act, allotting the lands of the Quapaw Indian reservation and requiring the allotments to be inalienable for 25 years after the date of the patents.[141] This Act created a trust relationship between the federal government and the Quapaw allottees that would, through additional laws and regulations, create enforceable fiduciary duties.

4.     On June 10, 1896, Congress amended the 1895 Act, authorizing allottees with land within the Quapaw Agency to lease their land for a term not exceeding three years for farming purposes, or five years for mining or business purposes.[142] Leases that did exceed the authorized time periods were considered violations of the restriction against alienation and therefore void.

5.     In 1897, Congress again amended the 1895 Allotment Act, extending the authority of competent Quapaw to enter into mining and business leases from five years to ten years.[143] Significantly, the Act also added a provision for the Secretary to lease for allottees who "by reason of age or disability . . . can not improve or manage his allotment

---

[140] 25 U.S.C. § 162a(d)(8).
[141] 28 Stat. 876, 907.
[142] 29 Stat. 321, 330–31.
[143] *See* Act of June 7, 1897, 30 Stat. 62, 72.

property and with benefit to himself."[144] Quapaw Indians who fell under this exception were commonly called "incompetent" Indians. A 1915 Supreme Court case confirmed the authority of the United States to sue as trustee for the Quapaw to enforce that lease restriction, holding that "[t]he Quapaws are still under national tutelage" and "[t]he guardianship of the United States continues."[145]

6.      On March 3, 1921, the 25-year restrictions on alienation were extended for an additional 25-year period for the lands owned by the "incompetent" Indians identified in the Act.[146] These restrictions were extended in 1939 under 53 Stat. 1127 (July 27, 1939), in 1970 under 84 Stat. 325 (June 25, 1970), and then indefinitely in 1990 under 104 Stat. 206 (May 25, 1990).[147]

7.      "Notwithstanding any other provision of law, the Secretary may approve any lease or agreement that affects individually owned allotted land or any other land held in trust or restricted status by the Secretary on behalf of an Indian."[148]

## C.      The Secretary of Interior has adopted regulations comprehensively governing the leasing of restricted Quapaw lands for agriculture, town lots, and mining

8.      As early as 1907, the Interior Department adopted regulations that applied to the surface leasing of allotted Indian lands.[149] These regulations required the Indian

---

[144] *See id.*, 30 Stat. at 72.
[145] *United States v. Noble*, 273 U.S. 74, 79 (1915).
[146] 41 Stat. 1225, 1248–49 (March 3, 1921).
[147] 53 Stat. 1127 (July 27, 1939); 84 Stat. 325 (June 25, 1970); 104 Stat. 206 (May 25, 1990).
[148] 25 U.S.C. § 2218.
[149] *See* Rules and Regulations Governing the Department of the Interior in its various branches, Part 4 (February 26, 1907) ("1907 Rules and Regulations").

agent to submit to the Secretary to approve lease applications for lands owned by "incompetent" Indians. The agent was required to assess and describe whether the lease would be to the advantage of the Indian allottees and to determine whether the rental or consideration agreed upon is fair and reasonable. The regulations also required agents to take necessary measures against trespassers.[150]

9.      In 1929, the Secretary of the Interior enacted *Regulations Governing the Leasing of Indian Allotted and Tribal Lands for Farming, Grazing and Business Purposes*.[151] These regulations applied to general surface leasing of allotted lands and expressly referenced the special Quapaw leasing laws, stating "where applicable, and not inconsistent with the above-mentioned special laws, the regulations herein prescribed shall govern leases thereunder."[152] Citing the March 3, 1921 Act, the regulations required leases on restricted Indian lands to be approved by the local superintendent.[153] The regulations required the Secretary to ensure the leases were "to the manifest advantage of the owners."[154] Other provisions in the lease include: an appraisal of the lease and a requirement that the leases be made at the highest possible rental;[155] a prohibition on subleasing;[156] a requirement that the Superintendent ensure lease compliance;[157]  and

---

[150] 1907 Rules and Regulations at 134, ¶ 641.
[151] Regulations Governing the Leasing of Indian Allotted and Tribal Lands for Farming, Grazing and Business Purposes (Apr. 4, 1929) ("1929 Regulations for Farming, Grazing, and Business").
[152] 1929 Regulations for Farming, Grazing, and Business ¶ 32.
[153] 1929 Regulations for Farming, Grazing, and Business ¶ 2 & 4.
[154] 1929 Regulations for Farming, Grazing, and Business ¶ 5.
[155] 1929 Regulations for Farming, Grazing, and Business ¶ 8.
[156] 1929 Regulations for Farming, Grazing, and Business ¶ 15.
[157] 1929 Regulations for Farming, Grazing, and Business ¶ 16.

reservation of improvements for the Indian landowner.[158]

10.     In 1938, when the Federal Government started publishing the Code of Federal Regulations, 25 C.F.R. was released setting forth the regulations for the leasing of Indian allotted lands for farming, grazing and business purposes. These regulations further set forth the requirements of the Secretary and Superintendent in leasing of allotted Indian lands. Starting on page 134, the Quapaw Analysis sets forth the obligations in the Code of Federal Regulations for Rights-of-Way, Non-Agricultural Leasing, Agricultural Leasing, and Quapaw Mineral Leasing.[159]

**D.     The Government's control and management of the Quapaw's trust funds and resources, as authorized by these statutes and regulations, goes far beyond a bare minimal level and therefore can be fairly interpreted as mandating compensation for a breach:**

11.     As the statutes and regulations gave the United States "full responsibility to manage Indian resources and land for the benefit of the Indians," we held that they "define[d] . . . contours of the United States' fiduciary responsibilities" beyond the "bare" or minimal level, and thus could "fairly be interpreted as mandating compensation" through money damages if the Government faltered in its responsibility.[160]

**E.     The Government has a money-mandating fiduciary duty to collect royalties and enforce mineral leases on Quapaw lands**

12.     Under the Indian Mineral Leasing Act (IMLA) of 1938, the Government is liable for its failure to manage or collect the proceeds of approved mining leases, which is

---

[158] 1929 Regulations for Farming, Grazing, and Business ¶ 22.
[159] Quapaw Analysis at 134–38 (2010).
[160] *White Mountain Apache Tribe*, 537 U.S. at 474.

a violation of trust responsibilities.[161] Under 25 C.F.R. § 211.40 and related regulations in 30 C.F.R., Subchapters A and D, the Government collects and manages all payments related to mineral leases unless those leases specify otherwise. The Government is then required to deposit and accrue interest on such proceeds pursuant to 25 U.S.C. §§ 161a, 161b, and 162a.[162]

13.     The Government has adopted regulations for the Quapaw reservation, under which the Government controls lead and zinc mining on Quapaw lands. Under those regulations no mining operations may take place without the approval of the Government,[163] all royalties are paid to the Government for the benefit of the Indian,[164] all leases are sold at public auction conducted by the Government,[165] at royalty rates set by the Secretary of Interior.[166] The Government may extend the lease,[167] and the Government requires a surety bond,[168] prescribes the term of the lease,[169] prescribes lease forms,[170] prescribes mineshaft construction requirements,[171] and prescribes and receives for the Indian lessees detailed accounts of all minerals sold, including prices.[172]

---

[161] *Shoshone Indian Tribe of Wind River Reservation v. United States*, 364 F.3d 1339, 1350 (Fed. Cir. 2004).
[162] *Shoshone Indian Tribe*, 364 F.3d at 1350.
[163] 25 C.F.R. § 215.1.
[164] 25 C.F.R. § 215.3.
[165] 25 C.F.R. § 215.4.
[166] 25 C.F.R. § 215.5.
[167] 25 C.F.R. § 215.10.
[168] 25 C.F.R. § 215.13.
[169] 25 C.F.R. § 215.18.
[170] 25 C.F.R. § 215.19.
[171] 25 C.F.R. § 215.22.
[172] 25 C.F.R. § 215.24.

**F.      The Government has a money-mandating duty to collect royalties and enforce lease provisions of chat leases it issues**

14.      "Chat sales produce moneys which are deposited to IIM accounts. Interests in chat piles are in the nature of 'credits in a trust status.' They are 'issues and/or profits' of trust lands . . ."[173] "[A]n interest in a chat pile is a form of trust personalty."[174] Courts have never disagreed that tailings and chat are, and always have been, considered restricted Indian property.[175]

15.      Under the Indian Long-Term Leasing Act,[176] and corresponding federal regulations, the Quapaw lead and zinc mining regulations,[177] and the laws and regulations relating to the disposition of federally managed Indian trust property, the United States has ultimate management and control over all aspects of the leasing and sale of chat. The Secretary of the Interior determines whether to consent to a lease and the terms of the lease; performs any and all acts "necessary for the purpose of carrying the provisions of this section into full force and effect"; and makes all rules and regulations as may be necessary to carry out the legislation, including:

- creating the standardized lease form that must be used;

- finalizing all the key terms of the lease such as assignability, protection of land by lessees, and the length of leases;

---

[173] *Matter of Elliott*, IP OK 246 P 93 (U.S. Dept. of Interior Office of Hearings & Appeals, Jan. 30, 1995).

[174] *Estate of Hoffman*, No. P-0000-67070-IP (U.S. Dept. of Interior Office of Hearings & Appeals Aug. 27, 2009).

[175] *See, e.g., Cole v. Asarco, Inc.*, 256 F.R.D. 690 (N.D. Okla. 2009); *Holder v. Gold Field Mining Corp.*, 506 F. Supp. 2d 792 (N.D. Okla. 2007).

[176] 25 U.S.C. §§ 396, 415–415d.

[177] 25 C.F.R. § 215.

- approving or disapproving the price terms and the royalty percentage;

- approving or disapproving any attempt to assign a lease from one lessee to another; and

- receiving all payments owed to the Quapaw—and then as middleman sending the proper amount of royalty payments and bonus payments to the chat owners.[178]

16.     "Any failure of the United States to prevent mineral trespass, if proven at trial, would be compensable as damages for breach of trust under *Mitchell II*."[179] So, "[t]he issue for trial is whether the United States acting as a trustee took appropriate measures to carry out its fiduciary responsibility to prevent mineral trespass. The regulations specifically provide that the United States is to safeguard tribes from mineral trespass, thereby creating a full trust responsibility pursuant to the control or supervision test contained in *Mitchell II*."[180]

### G.     The Government has a money-mandating fiduciary duty to collect rents and enforce leases on the Quapaw's agricultural lands

17.     As early as 1891, an amendment to the Dawes Act authorized the leasing of occupied allotted land for three years for farming and grazing purposes subject to the approval of the Secretary where "by reason of age or other disability, any allottee under the provisions of said act, or any other act or treaty can not personally and with the benefit to himself occupy or improve his allotment."[181] By 1894, a statute provided that surplus lands of any tribe could be leased for farming purposes by the Tribe's council

---

[178] 25 U.S.C. §§ 391–416i.
[179] *Shoshone Indian Tribe of Wind River Reservation v. United States*, 52 Fed. Cl. 614, 628 (2002).
[180] *Id.*
[181] 25 U.S.C. 397, 26 Stat. 794 (Feb. 28, 1891).

under the same rules and regulations as previously enacted for the same term as grazing, of up to five years.[182] And, in 1900, Congress enacted a statute to lease allotted lands when the allottee was incapacitated by reason of age, disability, or inability for a period not to exceed five years for farming purposes only.[183]

18.    The 1907 regulations adopted by the Interior Department for surface leasing included agricultural leasing.[184] According to the regulations, "[i]f the Indians of a reservation desire to lease their surplus land for farming, grazing, or mining purposes, the agent should submit the question to the Indian Office."[185] Agents of the Department of Interior had "the duty . . . to study the topography and general characteristics of their reservations, for the purposes of ascertaining whether irrigation is necessary and feasible."[186] Agents were also responsible for ensuring "that the established route [for cattlemen] is not deviated from, and that unnecessary time is not consumed upon the reservation"[187] and the Indian Office had to first approve any "white person" who wished to "drive stock across Indian reservations."[188] Agents also had general authority to deal with trespassers, and under the regulations "[a]gents are instructed to take such measures, not inconsistent with law, as may be necessary to protect those Indians who have adopted the habits of civilized life, and received their lands in severalty by allotment, in the quiet

---

[182] 25 U.S.C. 402, 28 Stat. 286, 305 (Aug. 15, 1894).
[183] 25 U.S.C. 395, 31 Stat. 221, 229 (May 29, 1900).
[184] *See* Rules and Regulations Governing the Department of the Interior in its various branches, Part 4 (February 26, 1907) ("1907 Rules and Regulations").
[185] 1907 Rules and Regulations ¶ 615.
[186] 1907 Rules and Regulations ¶ 645.
[187] 1907 Rules and Regulations ¶ 620.
[188] 1907 Rules and Regulations ¶ 621.

enjoyment of the lands allotted to them."[189]

19.     A 1910 Act allowed allottees to lease their allotments not to exceed five

years, pursuant to Secretarial rules and regulations.[190] The land of any allottee that died

before expiration of the trust period, without assignment of the allotment before death or

by will, was subject to the discretion of the Secretary of Interior. The Secretary was to

determine legal heirs, decide in his or her discretion the heirs' competency, and if

determined to be incompetent, cause the lands to be sold with the proceeds of the sale

held in trust for the incompetent heirs.[191]

20.     The Secretary had authority as of 1916 to lease arid allotted lands not to

exceed ten years, where it was determined "to the satisfaction of the Secretary" that the

allottee was unable to occupy and improve allotments due to old age or other disability.[192]

The leases were subject to all the terms, rules, and regulations of the Secretary.[193]

Additionally, a 1921 Act gave the superintendent or Secretary the exclusive authority to

approve leasing for farming or grazing purposes of restricted allotments.[194]

21.     Regulations for the leasing of Indian allotted and tribal lands for farming,

grazing, and business were first published in the Code of Federal Register in 1938 under

---

[189] 1907 Rules and Regulations ¶ 641.
[190] 25 U.S.C. 403, 36 Stat. 855 (June 25, 1910).
[191] 25 U.S.C. 403, 36 Stat. 855, 856.
[192] 25 U.S.C. 394, 39 Stat. 123, 128 (May 18, 1916); *see also* Ltr. from U.S. Indian Superintendent to Clara May Buffalo (Apr. 6, 1916) (notifying the allottee that the Secretary of the Interior will "supervise the leasing of your restricted Indian Lands") (*Goodeagle* Doc. 162-5).
[193] 25 U.S.C. 394, 39 Stat. 123, 128
[194] 25 U.S.C. 393, 41 Stat. 1225, 1232 (Mar. 3, 1921).

the authority of the statutes enacted from 1891–1921.[195] The regulations imposed duties on the Secretary in terms of the form and terms of leasing and the negotiation of leases on behalf of incompetent allottees.[196] If an allottee was deemed by the Superintendent to have the requisite knowledge, experience, and business capacity, the allottee "may be permitted to negotiate their own leases and collect rents," but the lease still must be approved by the Superintendent.[197]

22.     The leasing of tribal lands for farming, grazing, or business purposes was permitted through leases for stated purposes or through permits revocable in the discretion of the Commissioner of Indian Affairs. And any "[p]ermits calling for an annual rental in excess of $1,000, and all leases, regardless of the amount of rental involved, should be submitted to the Washington Office for consideration."[198] The regulations additionally put time limits on negotiation,[199] acreage limits on leases,[200] restrictions on assignments, subleases, and transfers,[201] and on payment of rentals.[202] At the Superintendent's discretion, additional time could be granted for payments of rentals with the consent of all interested persons.[203] The regulations additionally set fees on the

---

[195] 25 C.F.R. § 171 (1938) ("*§§171.1 to 171.36 inclusive, (with the exceptions noted in the text,) issued under the authority contained in 26 Stat. 795, sec. 1, 28 Stat. 305, sec. 1, 31 Stat. 229, sec. 4, 36 Stat. 856, sec. 1, 39 Stat. 128, sec. 1, 41 Stat. 1232; 25 U.S.C. 397, 402, 395, 403, 394, 393.")
[196] 25 C.F.R. § 171.1; *id.* § 171.2; *id.* § 171.3.
[197] 25 C.F.R. § 171.1.
[198] 25 C.F.R. § 171.12.
[199] 25 C.F.R. § 171.14.
[200] 25 C.F.R. § 171.15.
[201] 25 C.F.R. § 171.17.
[202] 25 C.F.R. § 171.16.
[203] 25 C.F.R. § 171.19.

rental value assessed to lessees, permittees, sublessees, and assignees.[204]

23.     The 1938 regulations suggest that at least some regulations existed as of 1929, aside from the 1907 surface leasing regulations, and the text of regulations regarding agricultural leasing can be identified for the periods 1938–2009.[205]

**H.     The Government has a money-mandating fiduciary duty under the Fifth Amendment to collect compensation for rights-of-way granted on Quapaw lands and to obtain compensation for conveying title to the Catholic Forty**

24.     Indian lands "are held subject to the authority of the general government to take them for such objects as are germane to the execution of the powers granted to it; provided only, that they are not taken without just compensation being made to the owner."[206] Indian lands "are held subject to the authority of the general government to take them for such objects as are germane to the execution of the powers granted to it; provided only, that they are not taken without just compensation being made to the owner."[207]

25.     As the Court of Claims held in a similar situation where the Government took tribal lands for a mission without the Tribe's permission, "[t]he act of patenting appellant's land to the Mission, without any compensation to the Indians, constituted a taking under the Fifth Amendment, for which [the Tribe] is entitled to just compensation."[208] And, "[i]t is obvious that Congress cannot simultaneously (1) act as

---

[204] 25 C.F.R. § 171.23.
[205] *See* Quapaw Analysis 144–51 & Quapaw Analysis Appendix 1 (Federal Regulations).
[206] *Cherokee Nation v. Southern Kansas R. Co.*, 135 U.S. 641, 657 (1890).
[207] *Cherokee Nation*, 135 U.S. at 657.
[208] *Fort Berthold Reservation v. United States*, 182 Ct. Cl. 543, 563–64 (1968).

trustee for the benefit of the Indians, exercising its plenary powers over the Indians and their property, as it thinks is in their best interests, and (2) exercise its sovereign power of eminent domain, taking the Indians' property within the meaning of the Fifth Amendment to the Constitution. In any given situation in which Congress has acted with regard to Indian people, it must have acted either in one capacity or the other. Congress can own two hats, but it cannot wear them both at the same time."[209]

## I.   The Government has a money-mandating duty to collect rents for rights-of-way or other easements on Quapaw lands

26.   A comprehensive set of statutes and regulations imposes a money-mandating duty on the Government to collect rents for rights-of-way or other easements on Quapaw lands. On February 15, 1901, Congress passed an act authorizing the Secretary of the Interior to grant rights-of-way through reservations for electrical lines, telephone lines, and pipelines.[210] On July 8, 1901, Regulations implementing this law were enacted.[211]

27.   On March 3, 1901, Congress passed legislation authorizing the Secretary to grant permission for rights-of-way for public roads and highways.[212] On March 15, 1901, Regulations were enacted setting forth guidelines for telephone rights-of-ways across

---

[209] *Fort Berthold*, 182 Ct. Cl. at 691.
[210] *See* An act relating to rights of way through certain parks, reservations, and other public lands, 31 Stat. 790 (Feb. 15, 1901).
[211] Regulations concerning right of way over public lands and reservations for telegraph and telephone lines, electrical plants, canals, reservoirs, tramroads, etc (July 8, 1901).
[212] *See* Act of March 3, 1901, 31 Stat. 1083 (Mar. 3, 1901)

Indian lands.[213]

28.     On March 11, 1904, Congress authorized the Secretary of Interior to grant a

right-of-way in the nature of an easement for the construction, operation, and

maintenance of pipe lines for the conveyance of oil and gas through any Indian

reservation, allotments, or other restricted lands.[214] The construction of a pipeline across

Indian lands is prohibited until authority therefore has been first obtained from the

Secretary of the Interior. Regulations promulgating this Act were passed April 8, 1904.[215]

These regulations required the Indian agent to determine the compensation or damages to

be given to the Indian landowner and prohibited companies from independently

negotiating with Indian allottees. These regulations were amended December 21, 1906.

29.     On March 4, 1911, Congress authorized the Secretary to grant easements

for electric, power, and telephone poles and lines.[216] Interior promulgated implementing

regulations on January 6, 1913.[217]And in 1928, Interior comprehensive right-of-way

---

[213] *See* Regulations of the Department of the Interior under Section 3 of the Act of March 3, 1901, concerning right of way for a telephone and telegraph line through any lands held by an Indian Tribe or Nation in the Indian Territory, through any lands reserved for an Indian Agency or Indian School or for other purpose in connection with the Indian Service, or through any lands which have been allotted in Severalty (Mar. 15, 1901).

[214] *See* An act authorizing the Secretary of the Interior to grant right-of-way for pipe lines through Indian lands, 33 Stat. 65 (Mar. 11, 1904).

[215] *See* Regulations of the Department of the Interior Under Act of March 11, 1904, Concerning Right of Way for the Construction, Operation, and Maintenance of Pipe Lines for the Conveyance of Oil And Gas Through any Lands Held by an Indian Tribe Or Nation in the Indian Territory, Through any Lands Reserved for an Indian Agency or Indian School, or for Other Purpose in Connection with the Indian Service, or Through any Lands which have been Allotted in Severalty (Apr. 8, 1904).

[216] *See* Act of March 4, 1911, 36 Stat. 1235, 1253-1254 (Mar. 4, 1911).

[217] *See* Regulations of the Department of the Interior concerning rights of way-electrical telegraph, and telephone poles and lines (Jan. 6, 1913).

regulations were adopted by the Secretary, applying to electric, pipelines, power, railways, roads, and telephones.[218] These regulations contain numerous duties for the Secretary in supervising the rights-of-way.

### J.  The Government has a money-mandating fiduciary duty to collect rents under town lot leases

30.   Congress authorized the Secretary of the U.S. Department of the Interior to lease Quapaw lands as town lots or otherwise permit town lot development and imposed on the Secretary the duty to collect rents and royalties from leasing of these lots.[219] Under a comprehensive regulatory and statutory scheme, including 25 C.F.R. § 162.108 and its predecessor regulations, the United States has a fiduciary duty and a trust obligation to (among others):

- "[E]nsure that tenants meet their payment obligations to Indian landowners, through the collection of rent on behalf of the landowners and the prompt initiation of appropriate collection and enforcement actions."

- "[A]ssist landowners in the enforcement of payment obligations that run directly to them, and in the exercise of any negotiated remedies that apply in addition to specific remedies made available to [the United States]  under these or other regulations."

- "[E]nsure that tenants comply with the operating requirements in their leases, through appropriate inspections and enforcement actions as needed to protect the interests of the Indian landowners and respond to concerns expressed by them."

---

[218] *See* Regulations of the Department of the Interior Concerning Rights of Way Over Indian Lands (May 22, 1928).

[219] *See* Ltr. from Miami Agency (1979) (QG04ALX0671165) ("As Bureau of Indian Affairs employees and trustee of restricted Indian land, we are responsible for ensuring a fair return for the rental or sale of their land.").

- "[T]ake immediate action to recover possession from trespassers operating without a lease, and take other emergency action as needed to preserve the value of the land."[220]

**K.      The Indian Land Consolidation Act and the federal Land Buy Back Program, and their implementing regulations and other foundational documents establish a fiduciary, money-mandating duty, which the Government has breached**

31.      The 2010 Claims Resolution Act and Land Buy-Back Program impose money-mandating fiduciary duties on the Secretary of the Interior to allow the Quapaw to participate in the consolidation of fractionated interest in their land. Under the Land Consolidation program, the Government purchases fractionated Indian interests with allocated federal funds, consolidates them in the name of the Tribe, and then the United States takes title as trustee, for the benefit of the Quapaw Tribe. Both of these statutes reflect an overall federal policy to consolidate tribal land holdings. In 1983, Congress passed the Indian Land Consolidation Act,[221] which was intended "to eliminate undivided fractional interests in allotments and consolidate tribal holdings."[222] As allottees and their heirs passed or otherwise transferred interests in allotments, interests in land fractionated and in many cases resulted in hundreds if not thousands of individuals owning very small interests in a single plot of land.[223] Under the Indian Land Consolidation Act, the Secretary of Interior is obligated to process land conveyances and to place such lands into

---

[220] Compl. ¶ 44 (June 28, 2012) (*Goodeagle* Doc. 1).

[221] Indian Land Consolidation Act, 25 U.S.C. §§ 2201–2221 (amended 1991, 2000, 2004, and 2008).

[222] *See generally* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 16.05[2][c] (2012 ed.).

[223] *See generally* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 16.05[2][b] (2012 ed.).

trust for the benefit of the purchasing tribe.[224]

32.     Under 25 U.S.C. § 2205(c), the Secretary has a non-discretionary duty to collect and transfer payments when a tribe purchases a fractionated interest that otherwise would have passed to a non-Indian. Sections 2209 and 2216(c) require that the Secretary take certain lands into trust—they place no discretion in the Secretary and instead require that the Secretary complete such transactions. Failure by the Secretary to process these transactions is properly viewed as a breach of trust with monetary relief available to remedy the breach.

33.     More recently Congress passed the Claims Resolution Act of 2010,[225] Pub. L. No. 111-291, 124 Stat. 3064 (Dec. 8, 2010), appropriating $1.9 billion for use in a Land Buy-Back Program, making funds available for use in resolving the problem of fractionation of Indian allotted lands through generations of descent and distribution.[226] The Claims Resolution Act of 2010, under which the Land Buy-Back Program was created, incorporates the 1983 Indian Land Consolidation Act, including the definition of "Land Consolidation Program," which is defined as "a program conducted in accordance with the Settlement [and] the Indian Land Consolidation Act (25 U.S.C. 2201 et seq.)."[227]

## L.     The Government has a money-mandating duty to conserve the Quapaw's natural resources

34.     Applicable law, including federal statutes, regulations, and the decisional

---

[224] *See generally* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 15.07[2] (2012 ed.).

[225] Claims Resolution Act of 2010, Pub. L. No. 111-291, 124 Stat. 3064 (Dec. 8, 2010).

[226] *See generally* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 16.05[2][b] (2012 ed.).

[227] Claims Resolution Act of 2010, § 101 (a)(4).

law, gives the United States full responsibility to manage Indian trust resources and land for the benefit of the tribal or individual Indian interest holders. This body of law thereby establishes a fiduciary relationship, and it defines the contours of the United States' fiduciary responsibilities.[228] Congress has decreed that "[t]he Secretary's proper discharge of the trust responsibilities of the United States shall include (but are not limited to) the following: (8) Appropriately managing the natural resources located within the boundaries of Indian reservations and trust lands."[229] Furthermore, "[t]he governing canon of construction requires that 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'"[230]

35.     The Government has a duty to use reasonable skill and care to make the trust property productive[231]—which the Government failed to do by allowing the natural resources of the Quapaw land to be ruined. The Government, as trustee, also has a duty to the Quapaw to take reasonable steps to take and keep control of the trust property.[232] For Indian land, the Government had a specific duty to obtain surety bonds for leases to protect the trust property, and in later years, compliance with NEPA[233]

36.     This Court has held that "[t]he Government had a duty to protect the

---

[228] *See, e.g.*, *United States v. Mitchell*, 463 U.S. 206, 224 (1983).

[229] 25 U.S.C. § 162a(d)(8).

[230] *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985)).

[231] RESTATEMENT (SECOND) OF TRUSTS § 181 (1959).

[232] RESTATEMENT (SECOND) OF TRUSTS § 175 (1959).

[233] 25 C.F.R. § 171.16 (1938); *id.* § 171.18 (1949); *id.* § 131.15 (1958); *id.* § 162.605(c) (2001); *id.* § 162.213(a)–(c) (2001); *id.* § 162.214(a)(2) (2001).

environment and manage the natural resources on the Quapaw land."[234] The Court also

stated:

> The presence of mining waste, toxic dust, and air pollution on Plaintiffs' land is the cumulative effect of the Government's alleged failure to properly manage the land's natural resources and supervise the mining activities thereon. "That failure, and the consequential damages resulting from it, constitute[s] the actionable wrong that [Plaintiffs] seek to vindicate."[235]

### M.    The Quapaw Analysis is binding on the Government

37.    The Court has ruled that "[t]he Quapaw Analysis is binding upon the

United States," and that "[t]he Court will not permit the United States to impeach this

detailed report, when it could have produced documents or raised its concerns at a much

earlier time."[236]

Respectfully submitted,

August 26, 2016

Of counsel:

Stephen R. Ward, Esq.
John L. Williams, Esq.
Conner & Winters, LLP
4000 One Williams Center
Tulsa, Oklahoma  74172-0148
(918) 586-8978 (telephone)
(918) 586-8698 (facsimile)
sward@cwlaw.com
jwilliams@cwlaw.com

s/  Nancie G. Marzulla
Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW, LLC
1150 Connecticut Avenue, N.W.
Suite 1050
Washington, D.C. 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)
nancie@marzulla.com
roger@marzulla.com

Counsel for Plaintiffs/Claimants

---

[234] *Goodeagle v. United States*, 111 Fed. Cl. 716, 724 (2013) (*Goodeagle* Doc. 27).
[235] *Goodeagle*, 111 Fed. Cl. at 724 (internal citations omitted).
[236] *Quapaw Tribe of Okla. v. United States*, 123 Fed. Cl. 673, 678 (2015).