# In the United States Court of Federal Claims

Nos. 12-431L, 12-592L, 13-51X

(Filed: November 14, 2019)

```
*****************************************
GRACE M. GOODEAGLE, et al.,              *
                    Plaintiffs,          *
v.                                       *
                                         *
THE UNITED STATES,                       *
                    Defendant.           *
*****************************************
QUAPAW NATION (O-GAH-PAH), A             *
FEDERALLY RECOGNIZED INDIAN              *
TRIBE,                                   *
                    Plaintiff,           *
v.                                       *
                                         *
THE UNITED STATES,                       *
                    Defendant.           *
*****************************************
THOMAS CHARLES BEAR, et al.,             *
                    Claimants,           *
v.                                       *
                                         *
THE UNITED STATES,                       *
                    Defendant.           *
*****************************************
```

Judicial Records; Public Disclosure; Settlement Agreement; Trial Court Discretion; 28 C.F.R. § 50.23; Congressional Reference Case; Hearing Officer; Indian Judgment Distribution Act; 25 U.S.C. § 1401.

*Nancie G. Marzulla*, with whom were *Roger J. Marzulla*, Marzulla Law, LLC, Washington, D.C., *Stephen R. Ward*, *Daniel E. Gomez*, *R. Daniel Carter*, *C. Austin Birnie*, Conner & Winters, LLP, Tulsa, Oklahoma, *Steven E. Bledsoe*, and *Lauren Wulfe*, Larson O'Brien LLP, Los Angeles, California, for the Quapaw Nation and certain individual Plaintiffs.

*Terry J. Barker*, with whom were *Joseph C. Woltz* and *Robert N. Lawrence*, Barker Woltz & Lawrence, Tulsa, Oklahoma, for certain individual Plaintiffs.

*Brian M. Collins*, with whom were *John C. Cruden*, Assistant Attorney General, *Frank J. Singer*, Environmental and Natural Resources Division, United States Department of Justice, *Kenneth Dalton*, *Shani N. Walker*, *Karen Boyd*, *Ericka Howard*, *Dondrae Maiden*, Office of the Solicitor, United States Department of the Interior, and *Thomas Kearns*, Office of the Chief Counsel, Bureau of the Fiscal Service, United States Department of the Treasury, Washington, D.C., for Defendant.

OPINION AND ORDER

WHEELER, Judge.

These consolidated cases arise out of the Government's alleged mismanagement of lands held in trust for members of the Quapaw Nation (O-Gah-Pah). There is no question that the Plaintiffs' land, which is now an EPA superfund site, was decimated by decades of mining operations. The issues presented in these cases were who was responsible for the destruction of the Plaintiffs' land, whether they should be compensated for that destruction, and how much money they were owed. After more than eight years of litigation in this Court alone, the parties agreed to settle the Goodeagle and Quapaw cases, and to recommend proposed findings of fact and conclusions of law in the Bear case.

Now before the Court is the question of whether the parties should be compelled to file their settlement agreement on the Court's public docket. For the reasons that are discussed below, the Court ORDERS the parties to do so.

Background

These cases have a long and torturous history. A fuller account of their factual background is available in the Court's opinion in Goodeagle v. United States, 111 Fed. Cl. 716, 718–720 (2013), and in the parties' Joint Agreement, Stipulation, and Recommendation for Proposed Findings of Fact and Conclusions of Law, available at Bear Dkt. 347. The following facts are relevant to this opinion.

These cases have been with the Court for more than eight years. The complaint in Goodeagle was filed on June 28, 2012, on behalf of individual members of the Quapaw Nation.[1] Goodeagle Dkt. 1. On September 11, 2012, the complaint in Quapaw was filed on behalf of the Quapaw Nation. Quapaw Dkt. 1. On December 19, 2012, the United States House of Representatives passed House Resolution 668, referring to the Chief Judge of this Court a bill, H.R. 5862, entitled "A Bill relating to members of the Quapaw Tribe

---

[1] The current iteration of Goodeagle is a restatement of claims that were originally filed in this Court on January 5, 2011, and subsequently dismissed. See Bear v. United States, 112 Fed. Cl. 480, 482 (2013) (citing Goodeagle, 111 Fed. Cl. 716).

of Oklahoma (O–Gah–Pah)." H.R. Res. 668, 112th Cong. § 1 (2012). Section 1 of the Resolution states:

> Pursuant to section 1492 of title 28, United States Code, the bill (H.R. 5862), entitled "A Bill relating to members of the Quapaw Tribe of Oklahoma (O–Gah–Pah)," now pending in the House of Representatives, is referred to the chief judge of the United States Court of Federal Claims for a determination as to whether the Tribe and its members have Indian trust-related legal or equitable claims against the United States other than the legal claims that are pending in the Court of Federal Claims on the date of enactment of this resolution.

Id. Section 2 of the Resolution contains the proceeding and report instructions to the Court upon receipt of the bill:

> Upon receipt of the bill, the chief judge shall—
>
> (1) proceed according to the provisions of sections 1492 and 2509 of title 28, United States Code, notwithstanding the bar of any statute of limitations; and
>
> (2) report back to the House of Representatives, at the earliest practicable date, providing—
>
>   (A) findings of fact and conclusions of law that are sufficient to inform the Congress of the nature, extent, and character of the Indian trust-related claims of the Quapaw Tribe of Oklahoma and its tribal members for compensation as legal or equitable claims against the United States other than the legal claims that are pending in the Court of Federal Claims on the date of enactment of this resolution; and
>
>   (B) the amount, if any, legally or equitably due from the United States to the claimants.

Id. § 2. The Clerk of the House transmitted H.R. Res. 668 to this Court on January 22, 2013. Bear Dkt. 1.

The three cases proceeded in parallel through discovery and motions for summary judgment, and were originally set for a consolidated trial to begin in October of 2016.[2] Bear Dkt. 109 at 1–2. On the morning trial was set to begin, the parties told the Court that they were "in active settlement negotiations." Bear Dkt. 190 at 6–8. Two days later, the parties reported that they had "reached agreement on all the key settlement terms," and requested that the court take all three cases off the trial calendar. See Bear Dkt. 184. By stipulation of the parties, the settlement discussions and negotiations were confidential. Bear Dkt. 181 at 2, 182 at 1.

The settlement negotiations continued until early 2019, but fell apart when a small group of Plaintiffs refused to ratify a proposed settlement agreement. E.g., Bear Dkt. 290 at 2 & n.2. Trial was reset to begin in September of 2019. Bear Dkt. 294. Two days before trial was to commence, the parties once again reported that they had "reached an agreement in principle regarding the key terms of a proposed global settlement of [the Plaintiffs'] claims in all three of the pending cases." Bear Dkt. 333 at 2. The parties subsequently reported that they had finalized their settlement agreement. E.g., Bear Dkt. 344 at 2.

At the October 24, 2019 status conference in these cases, the Court asked the parties whether they intended to file their settlement agreement on the Court's public docket. While Plaintiffs' counsel had no objection to doing so, counsel for the Government objected. The Court invited the parties to file position papers further detailing their views on this issue. The Government filed its paper on October 30, 2019, and the Plaintiffs filed theirs on November 5 and 6, 2019. The issue is now fully briefed and ripe for decision.

Discussion

The Government raises three reasons why the parties should not file their settlement agreement with the Court. First, the Government argues that the agreement is not a judicial record. Second, the Government says that the parties took great pains to keep their settlement negotiations confidential, and that it would be inappropriate for the Court to use the settlement agreement to inform its report to Congress in the Bear case. Finally, the Government claims that filing the settlement agreement could trigger the Indian Judgment Distribution Act, 25 U.S.C. §§ 1401–08. The Government's arguments are not persuasive.

---

[2] The Court heard two days of trial testimony in Oklahoma in September of 2016, to accommodate certain elderly witnesses who would have had a difficult time travelling to Washington, D.C. for the October trial dates. See Bear Dkt. 106, 186, 188.

4

A. <u>A Judicial Record</u>

To determine whether documents related to a case should be publicly available, courts consider whether the documents are judicial records; if they are, the court then weighs the public's right of access against the interests favoring nondisclosure. <u>In re Fort Totten Metrorail Cases</u>, 960 F. Supp. 2d 2, 6 (D.D.C. 2013). Whether a document is a judicial record depends on "the role it plays in the adjudicatory process." <u>United States v. El-Sayegh</u>, 131 F.3d 158, 163 (D.C. Cir. 1997); <u>see also</u> <u>Anderson v. Cryovac, Inc.</u>, 805 F.2d 1, 13 (1st Cir. 1986). When determining whether a document plays a role in the adjudicatory process, courts consider whether it is "germane" to a judicial decision, has been submitted to the court, and is "relevant and material" to matters the court is considering. <u>F.T.C. v. Standard Fin. Mgmt. Corp.</u>, 830 F.2d 404, 410 (1st Cir. 1987); <u>see also</u> <u>United States v. Amodeo</u>, 44 F.3d 141, 145 (2d Cir. 1995) ("[T]he mere filing of a . . . document with the court is insufficient to render that paper a judicial document . . . . [T]he item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document.").

It is true, as the Government argues in its position paper, that the settlement agreement is distinguishable from the documents at issue in other judicial record cases. See <u>Goodeagle</u> Dkt. 377 at 3. In a typical judicial record case, the document at issue has already been filed with the court. <u>See</u> <u>id.</u> (citing <u>In re Fort Totten Metrorail Cases</u>, 960 F. Supp. 2d at 5). In the instant cases, the settlement agreement has not yet been filed. However, on the facts of this case, this is a distinction without a difference. The touchstone of the analysis is not whether the document has been filed with the Court; rather it is whether it is relevant to the Court's decision-making process. <u>See, e.g.</u>, <u>Amodeo</u>, 44 F.3d at 145. Here, there can be no question that the settlement agreement that disposed of the Plaintiffs' claims in <u>Goodeagle</u> and <u>Quapaw</u> is relevant to the Court's duties in <u>Bear</u>.

When it referred <u>Bear</u> to the Court, Congress specifically required that the Court consider "whether the Tribe and its members have Indian trust-related legal or equitable claims against the United States <u>other than the legal claims that are pending in the Court of Federal Claims on the date of enactment of this resolution</u>." H.R. Res. 668, 112th Cong. § 1 (2012) (emphasis added); <u>see also id.</u> § 2. By congressional mandate, then, this Court—both the hearing officer and the three-judge review panel—must know what claims were disposed of when the parties settled <u>Goodeagle</u> and <u>Quapaw</u> in order to evaluate the parties' proposed resolution of <u>Bear</u>. <u>See</u> RCFC App. D 5. Therefore, the settlement agreement is a judicial record.

Once a court determines that a document is a judicial record, the decision as to whether the public should be able to access it is "left to [its] sound discretion . . . , a discretion to be exercised in light of the relevant facts and circumstances of the particular

5

case." Johnson v. Greater Se. Cmty. Hosp. Corp., 951 F.2d 1268, 1277 (D.C. Cir. 1991) (quoting United States v. Hubbard, 650 F.2d 293, 316–17 (D.C. Cir. 1980)). In weighing whether public disclosure is appropriate, courts can consider several factors, including "the strong presumption of public access to judicial proceedings," the strength of the privacy interests involved, and the identity of those objecting to disclosure. See Hubbard, 650 F.2d at 317–22. If a court is weighing whether to publicly disclose a settlement agreement, and the "agreement involves issues or parties of a public nature, and involves matters of legitimate public concern, that should be a factor weighing" in favor of public disclosure. Pansy v. Borough of Stroudsburg, 23 F.3d 772, 788 (3d Cir. 1994). This is because "in cases where the government is a party . . . the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch." Standard Fin. Mgmt. Corp., 830 F.2d at 410.

The facts of this case weigh strongly in favor of public disclosure. To begin with, it is the Government, not the Plaintiffs, that is opposed to public access to the settlement agreement. Compare Goodeagle Dkt. 377, with Bear Dkt. 348, and Bear Dkt. 349. The Government's sole argument against public disclosure is that it does not believe the settlement agreement is a judicial record. See Goodeagle Dkt. 377 at 4. As discussed above, the Court finds that the agreement is a judicial record, so this argument carries no weight in this part of the analysis. Since the Government raises no other argument against disclosure, its position is outweighed by the strong presumption of public access to judicial proceedings and the public's right to monitor both the Government and this Court. This is particularly true given the strong public interest in this case. See, e.g., Letter from Tom Cole, Deputy Whip, U.S. House of Representatives, to Susan G. Braden, Chief Judge, U.S. Court of Federal Claims (Apr. 11, 2018) (on file with the Court) ("Although Congress has patiently awaited [progress in these cases] for five years, we now respectfully request that you complete your review of these pending claims and report back to Congress as requested forthwith."); Autumn Bracey, Quapaw Nation Announces $200 Million Trust Settlement With U.S. Government, KSNF/KODE (Oct. 25, 2019, 9:54 PM), https://www.fourstateshomepage.com/news/quapaw-nation-announces-200-million-trust-settlement-with-us-government/; Settlement of Quapaw Trust Litigation Announced, Miami News-Record (Oct. 4, 2019, 1:03 PM), https://www.miamiok.com/news/20191004/settlement-of-quapaw-trust-litigation-announced.

Department of Justice regulations, too, favor public disclosure. Specifically, 28 C.F.R. § 50.23(a) says:

> It is the policy of the Department of Justice that, in any civil matter in which the Department is representing the interests of the United States or its agencies, it will not enter into final settlement agreements . . . that are subject to confidentiality provisions . . . . This policy flows from the principle of

openness in government and is consistent with the Department's policies regarding openness in judicial proceedings . . . and the Freedom of Information Act.

The regulation does allow for "rare circumstances that warrant an exception to this general rule," but maintains that "such circumstances must be considered in the context of the public's strong interest in knowing about the conduct of its Government and expenditure of its resources." Id. § 50.23(b). The Government fails to identify any special circumstances requiring confidentiality in this case, so the public's strong interest in public disclosure must win the day.

In sum, the parties' settlement agreement disposing of the Plaintiffs' Goodeagle and Quapaw claims is a judicial record that the public is entitled to access.

B. Confidential Negotiations and the Disposition of Bear

The Government's next argument has two steps. First, the Government points out that its settlement negotiations were confidential. Goodeagle Dkt. 377 at 5. Therefore, says the Government, it would be inappropriate for the Court to "use . . . the final product of [the] confidential settlement discussions in Quapaw and Goodeagle to inform its disposition of the Bear case." Id. The Government's argument fails at both steps.

First, it is true that the settlement negotiations were confidential. The Court entered an order to this effect in September of 2016. See Bear Dkt. 182 at 1. However, the order applied only to "settlement discussions and communications," not to the final settlement agreement. See id. The agreement itself contains no such confidentiality provision. See Bear Dkt. 348 at 5. Moreover, the Government has not indicated that an Assistant Attorney General or a more senior Department of Justice official has approved a confidentiality provision, as is required by 28 C.F.R. § 50.23(b). Thus, while the settlement negotiations were and are confidential, it does not follow that the settlement itself should be.

The next step of the Government's argument is equally flawed. The Government claims to have "significant concerns" that the Court will make use of the settlement agreement in preparing its report to Congress in the Bear case. Goodeagle Dkt. 377 at 5. However, as discussed above, Congress specifically required the Court to consider "whether the Tribe and its members have Indian trust-related legal or equitable claims against the United States other than the legal claims that are pending in the Court of Federal Claims on the date of enactment of this resolution." H.R. Res. 668, 112th Cong. § 1 (2012). The Government's "significant concerns" therefore appear to arise out of a fear that the Court will follow Congress's clear mandate: to evaluate the claims in Bear with reference

to the claims in Goodeagle and Quapaw. The Court, unlike the Government, has no concerns about following a clear congressional directive.

The parties' settlement agreement is not confidential, and the Court is required to review it in preparing its report to Congress in the Bear case.

### C. The Distribution Act

Finally, the Government claims that filing the settlement agreement with the Court could trigger the Indian Judgment Distribution Act "if the Court were to subsequently enter a judgment based on [the settlement]." Dkt. 377 at 5–6 (citing 25 U.S.C. §§ 1401–08). This argument is specious and divorced from the facts of this case. As the Government acknowledges in its position paper, the Distribution Act only applies when funds are "appropriated in satisfaction of a judgment of the . . . United States Court of Federal Claims." § 1401(a). The parties could not trigger the Act merely by filing their settlement agreement with the Court, because the Act only applies when the Court enters "a judgment." Id. The parties have specifically indicated that they will not ask the Court to enter judgment in Goodeagle and Quapaw. See Bear Dkt. 343 at 6. At no time during the October 24, 2019 status conference did the Court indicate any intention to enter judgment in the Goodeagle and Quapaw cases. Nor does it intend to do so now. Therefore, this argument, too, is without merit.

### Conclusion

For the reasons discussed above, none of the Government's reasons for opposing filing the parties' settlement agreement on the Court's public docket are persuasive. The parties are therefore ORDERED to file their settlement agreement with the Court forthwith. If the parties are concerned that the agreement contains private information about individuals, they may initially file it under seal. Within seven days of filing the settlement agreement with the Court, counsel for the parties shall propose any redactions before the agreement is filed on the Court's public docket.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge